973 A.2d 347

CHRISTINE SABA FAWZY, PLAINTIFF–APPELLANT AND
CROSS–RESPONDENT, v. SAMIH M. FAWZY, DEFEN-
DANT–RESPONDENT AND CROSS–APPELLANT.

Argued February 3, 2009—Decided July 1, 2009.

458

*Brian G. Paul,* argued the cause for appellant and cross-respondent (*Szaferman, Lakind, Blumstein & Blader,* attorneys).

*Dale E. Console,* argued the cause for respondent and cross-appellant.

*Peggy Sheahan Knee,* submitted a brief on behalf of *amicus curiae* New Jersey State Bar Association (*Ms. Knee,* President, and *Einhorn, Harris, Ascher, Barbarito & Frost,* attorneys; *Ms. Knee* and *Bonnie C. Frost,* on the brief).

Justice LONG delivered the opinion of the Court.

At issue in this appeal is whether parties to a matrimonial action may agree to submit questions regarding child custody and parenting time to binding arbitration, and if so, what standard of review will apply. More particularly, we have been asked by a matrimonial litigant to declare arbitration of issues involving children an affront to the exercise of our *parens patriae* jurisdiction. Alternatively, we have been requested to establish a best-interests standard as the basis for judicial intervention into an otherwise binding arbitration award.

We hold that within the constitutionally protected sphere of parental autonomy is the right of parents to choose the forum in

which their disputes over child custody and rearing will be resolved, including arbitration. Deference to the parties' choice of forum requires certainty regarding that choice; an agreement to arbitrate must be in writing or otherwise recorded and must clearly establish that the parties are aware of their rights to a judicial determination and have knowingly and voluntarily waived them. Once arbitrated, the matter is subject to review under the narrow provisions of New Jersey's version of the Uniform Arbitration Act ("Arbitration Act"), *N.J.S.A.* 2A:23B–1 to –32. The only exception is the case in which a party establishes that the arbitrator's award threatens harm to the child. Best interests is not the standard for judicial review of an arbitration award. Only a threat of harm will justify judicial infringement on the fundamental right of parents to decide how to resolve disputes over their children's upbringing.

A child-custody or parenting-time arbitration should be conducted in accordance with the principles established in the Arbitration Act. However, because the Arbitration Act does not require the recording of testimony or a statement of findings and conclusions by the arbitrator, we depart from it by mandating that a record of all documentary evidence adduced during the arbitration proceedings be kept; that testimony be recorded; and that the arbitrator issue findings of fact and conclusions of law in respect of the award of custody and parenting time. Without that, courts will be in no position to evaluate a challenge to the award.

I.

Plaintiff, Christine Saba Fawzy, and defendant, Samih M. Fawzy, were married on September 28, 1991, and have two children born in 1996 and 1997, respectively. On September 13, 2005, Mrs. Fawzy filed a complaint for divorce. Leonard R. Busch, Esq., was appointed as guardian ad litem for the children.

On January 22, 2007, the day on which the trial on all issues was to take place, the parties apparently notified the judge that they had agreed to arbitrate in place of proceeding to trial. The judge

informed Busch, who appeared by telephone, that "the lawyers have agreed to this: that they're really going to convert or actually double your hat [in] that they're asking you to also serve as the binding arbitrator in this case on all issues" and that "the bottom line is that you should be aware that the parties have agreed to let you arbitrate all issues." The judge stated that he would delay issuing the judgment of divorce until March 5, 2007, which would give the parties six weeks to complete the arbitration proceedings.

During the same proceeding, after dealing with issues of fees and payments, the attorney for Mr. Fawzy asked that the parties be sworn and place on the record their agreement to submit the case to arbitration. The following colloquy ensued:

[THE COURT:] Both of you need and want closure as do your children. Arbitration is unappealable. If I make a decision and either of you decides to take it to a higher court, arbitration is unappealable. You can never—neither you nor she can ever return to court, except in one or two circumstances. And here's how you can return.

If there's a change of circumstances, you can return. Now, a change of circumstances is a legal term of art. What that means is—let me give you a hypothetical. You've got two children. Issues regarding [ ] children are always open.

Let me give you an example as to children as to money. If down the road, you or your wife believe that—that circumstances have changed and that the best interests of your children will be served by a modification of Mr. Busch's order, which again as the arbitrator he's—he'll be deciding parenting time, not recommending it. He'll be deciding it. If down the road, either of you think that his—his order should be modified, you can make an application to [the] court.

Let's assume there's a child support obligation, and I assume there will be. If someone's financial circumstances change, you can return to court. Child support can always be revisited. Alimony, too, theoretically, but I'm addressing child support since that's my primary concern.

I think the incomes are, again, about $80,000.00 and $40,000.00. If, hypothetically, someone's income doubles and this are not—these are no magic barometers. If someone's income doubles or if someone loses their job, someone can say we need a modification of the financial obligations.

Here's what you can't do. You can't come back to me and say I don't like the award or I think Mr. Busch was partial or I think he was unbalanced. Neither side could do that.

But either side could come back and say since Mr. Busch decided this matter or—or—or gave a decision, things have changed. For example, Mrs. Fawzy could

say—let's assume Mrs. Fawzy has the children. She can say Mr. Fawzy won the lottery, so, therefore, I want more money for our children for them to go to, say, better camps.

And Mr. Fawzy vice versa. If Mrs. Fawzy hypothetically wins the lottery—this suggests, obviously, a very extreme example—you could say well, my God, she should be paying more of the children's—because she's got all this extra money—because when it comes to the issue of child support, all sources of income are available.

If either of you, say, got an inheritance, that is your property, not subject to distribution. Inheritances belong to the person inheriting it, period, except for this. If either of you inherited money, I could look at that as to a child support obligation, but I can't give the other side a part of it. That's the difference between what I call equitable distribution and support.

If either of you—if either of you inherits a — a — a building that pays off rents, neither side will ever get a piece of the building because that remains theirs. But I could look at the rents to say well, out of those rents, child support should be changed.

So, there's a difference between giving someone a piece of property and considering it income flow from an inheritance. There's a difference. But I only—oh.

There's one other instance in which you can return to court. To enforce the award. If Mr. Busch's award says X dollars in child support and someone's not paying it, you can come back to court to enforce that. But you can't come back to court because you've said I don't like Mr. Busch's decision.

Okay. Now, before either side is questioned by their attorney, Mrs. Fawzy, do you understand and agree to everything I just said?

MRS. FAWZY: Yes, I do.

THE COURT: Sir, do you?

MR. FAWZY: Yes, I do.

THE COURT: Okay. Thank you.

Now, Mr. Burns, do you want to ask your client any questions?

MR. BURNS: No, Judge. I think she's testified that she understands and is willing to be bound by it.

## Mr. Goldstein, Mr. Fawzy's attorney, then questioned his client:

[MR. GOLDSTEIN]: Mr. Fawzy, Judge Berman said it, and I said it to you. It's now about 5 after 12:00 and we've been here virtually since 9:00 a.m. discussing after Mr. Burns and I came out of chambers the prospect of this arbitration, and I've been talking to you on and off about it. Is that correct?

[MR. FAWZY]: Yes.

[MR. GOLDSTEIN]: Do you understand that nobody's forcing you or coercing you, that this is, in fact, a voluntary course of action that you're pursuing?

[MR. FAWZY]: Yes.

[MR. GOLDSTEIN]: And if—if you chose not to do it, the Judge could not and would not frown upon you and Judge Berman would do his job and hear your case in the future. Do you understand that?

[MR. FAWZY]: Yes.

[MR. GOLDSTEIN]: In fact, Judge Berman was ready to try your case today, but for a host of reasons the case isn't ready because of issues with Mr. Busch and—and not his doing but we need Mr. Busch and also Dr. Rosenbaum. Do you understand that?

[MR. FAWZY]: Yes.

When asked if he had any questions, Mr. Fawzy only inquired about the implications of a statement that the judge had made about the family income.

On March 6, 2007, judgment of divorce was entered, including reference to the agreement to arbitrate. The attorneys signed an interim arbitration order on March 14, 2007 which stated that "[t]he parties agreed to enter into Binding Arbitration pursuant to *N.J.S.A.* 2A:24–1, et seq."[1]

Subsequently, Busch heard testimony regarding custody and parenting time. On March 28, 2007, while the arbitration process was in progress, Mr. Fawzy filed an order to show cause seeking to restrain Busch from issuing a custody or parenting-time award, on the grounds that those issues could not, as a matter of law, be arbitrated, and that, in any event, he was rushed and pressured into agreeing to the arbitration.

At a hearing on March 29, 2007, Mr. Fawzy's attorney argued, among other things, that his client felt he would be seen in a "bad light" and as uncooperative if he did not agree to arbitration. The judge denied the application, noting that Mr. Fawzy's character-ization of the arbitration as unreviewable was inaccurate because the award could be modified based on changed circumstances, and

---

[1] Although the interim order indicated that the parties were submitting their dispute to "Binding Arbitration pursuant to *N.J.S.A.* 2A:24–1, et seq.," in 2003 that statute was partially superseded by *N.J.S.A.* 2A:23B–1 to –32, *L.* 2003, *c.* 95. All agreements to arbitrate made on or after January 1, 2005, are governed by *N.J.S.A.* 2A:23B–1 to –32, except for collective bargaining agreements. *N.J.S.A.* 2A:23B–3(c). *N.J.S.A.* 2A:24–1 to –11 now governs only the arbitration of collective bargaining agreements.

the award could be vacated under *N.J.S.A.* 2A:24–8(d) if the arbitrator exceeded his powers or if he executed them imperfectly.

Busch issued a custody and parenting-time award on April 4, 2007, which granted the parties joint legal custody with primary physical custody to Mrs. Fawzy; designated Mrs. Fawzy as the parent of primary residence; and granted Mr. Fawzy weekday, weekend, vacation, and holiday parenting time. Arbitration continued on the remaining financial issues.

On May 14, 2007, Mr. Fawzy filed a second order to show cause, that time to vacate the arbitration award and to disqualify Busch from any further participation in the case. In the alternative, he requested that the court review the award de novo or stay the award pending appeal. Mr. Fawzy certified that he did not understand the rights he was waiving when he agreed to arbitration, and that he had not been involved in the process that led to the interim order. The trial judge denied that application after a hearing and entered an amended judgment of divorce on May 14, 2007, which confirmed the award; he also ordered both Mr. and Mrs. Fawzy to comply with its terms.[2]

Mr. Fawzy appealed, contending that parties cannot submit custody issues to binding arbitration because doing so deprives the court of its *parens patriae* obligation to assure the best interests of the child. In reversing, the Appellate Division noted that it was "troubled by [Mr. Fawzy]'s failure" to establish that the award would harm the children, *Fawzy v. Fawzy*, 400 *N.J.Super.* 567, 570, 948 *A.2d* 709 (App.Div.2008), but ultimately held that matrimonial litigants cannot submit custody issues to final, binding, non-appealable arbitration, *id.* at 572, 948 *A.2d* 709. Thus, the Appellate Division reversed the trial judge's decision and remanded for a plenary hearing on the custody and parenting-time issues. *Id.* at 572, 948 *A.2d* 709.

---

[2] A second amended judgment of divorce was filed on August 3, 2007, which incorporated the final arbitration award on the remaining issues.

Mrs. Fawzy filed a petition for certification, and Mr. Fawzy filed a cross-petition on the issue of whether an arbitrator in a child-custody proceeding may also serve as a guardian ad litem in that proceeding. We granted both the petition and cross-petition, 196 *N.J.* 595, 960 *A.*2d 391 (2008), and now affirm the judgment of the Appellate Division, but not for the reasons it expressed.

## II.

Mrs. Fawzy argues: that arbitration of custody and parenting-time issues is authorized under the Arbitration Act; that this Court should provide a procedure that would permit parents to engage in binding arbitration for custody and parenting time; that any holding that grants litigants an automatic de novo review of an arbitrator's custody determination would result in two custody trials in virtually every arbitrated custody case, directly conflicting with the public policy rationale underlying arbitration; and that the court's *parens patriae* power should be limited to instances where there is a showing that the child has been placed at serious risk of harm.

Mr. Fawzy counters: that the interim order signed by both parties incorrectly indicated the arbitration would be held pursuant to *N.J.S.A.* 2A:24–1 to –11, a provision governing collective bargaining; that the best interests of the child cannot be protected within the confines of the statutory framework of *N.J.S.A.* 2A:23B–1 to –32; that the public policy underlying the Court's *parens patriae* obligations precludes binding arbitration of custody issues; that parties must have a written agreement defining the scope of binding arbitration, including a requirement that the arbitration process be on record with full findings of fact and conclusions of law; that parties must be given adequate time to agree on the terms of arbitration with full knowledge of the rights they are waiving; that this Court should not impose an affirmative obligation to demonstrate a risk of harm to the children in order to submit arbitrated custody issues to appellate review; and that parties should be afforded automatic review unless it is clear on

the face of the award that it will not harm the child's best interests. Finally, he argues that a person who has been appointed guardian ad litem cannot serve as the arbitrator because there is an inherent conflict between the responsibilities of those two roles.

Amicus curiae New Jersey State Bar Association argues that "arbitration of custody/parenting time should be encouraged" and suggests the adoption of the following procedural safeguards: a written arbitration agreement that outlines the structure of the proceeding and the method for review; a record including both the transcript of testimony and the arbitrator's findings of fact and conclusions of law; the application of the *Court Rules* and the *Rules of Evidence;* the application of case law and the best-interests-of-the-child standard; and de novo review of the arbitrator's decision by a trial court.

## III.

We begin with some brief observations regarding arbitration, which is " 'a method of dispute resolution involving one or more neutral third parties who are usu[ally] agreed to by the disputing parties and whose decision is binding.' " *Wash. Auto. Co. v. 1828 L St. Assocs.,* 906 A.2d 869, 878 (D.C.2006) (alteration in original) (quoting *Black's Law Dictionary* 112 (8th ed. 2004)). "Our courts have long noted our public policy that encourages the 'use of arbitration proceedings as an alternative forum.' " *Wein v. Morris,* 194 *N.J.* 364, 375–76, 944 A.2d 642 (2008) (quoting *Perini Corp. v. Greate Bay Hotel & Casino, Inc.,* 129 *N.J.* 479, 489, 610 A.2d 364 (1992)).

[Arbitration's] object is the final disposition, in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between the parties. Arbitration can attain its goal of providing final, speedy and inexpensive settlement of disputes only if judicial interference with the process is minimized; it is, after all, meant to be a substitute for and not a springboard for litigation.

[*Barcon Assocs., Inc. v. Tri–County Asphalt Corp.,* 86 *N.J.* 179, 187, 430 A.2d 214 (1981) (quotation marks and citations omitted).]

■ "Although arbitration is traditionally described as a favored remedy, it is, at its heart, a creature of contract." *Kimm v. Blisset, LLC,* 388 *N.J.Super.* 14, 25, 905 *A.*2d 887 (App.Div.2006) (citations omitted), *certif. denied,* 189 *N.J.* 428, 915 *A.*2d 1051 (2007); *see also McKeeby v. Arthur,* 7 *N.J.* 174, 181, 81 *A.*2d 1 (1951) ("An arbitration agreement is a contract and is subject, in general, to the legal rules governing the construction of contracts." (citation omitted)). It is for that reason that binding arbitration cannot be imposed by judicial fiat.

■ "In the absence of a consensual understanding, neither party is entitled to force the other to arbitrate their dispute. Subsumed in this principle is the proposition that only those issues may be arbitrated which the parties have agreed shall be." *In re Arbitration Between Grover & Universal Underwriters Ins. Co.,* 80 *N.J.* 221, 228–29, 403 *A.*2d 448 (1979). As we stated in *Garfinkel v. Morristown Obstetrics & Gynecology Associates, P.A.,* 168 *N.J.* 124, 132, 773 *A.*2d 665 (2001):

> In respect of specific contractual language, "[a] clause depriving a citizen of access to the courts should clearly state its purpose. The point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue." *Marchak [v. Claridge Commons, Inc.,* 134 *N.J.* 275, 282, 633 *A.*2d 531 (1993)]. As we have stressed in other contexts, a party's waiver of statutory rights "must be clearly and unmistakably established, and contractual language alleged to constitute a waiver will not be read expansively." *Red Bank Reg'l Educ. Ass'n [v. Red Bank Reg'l High Sch. Bd. of Educ.,* 78 *N.J.* 122, 140, 393 *A.*2d 267 (1978)]. In the same vein, a "court may not rewrite a contract to broaden the scope of arbitration[.]" *Yale Materials Handling Corp. v. White Storage & Retrieval Sys., Inc.,* 240 *N.J.Super.* 370, 374, 573 *A.*2d 484 (App.Div.1990).
>
> [(First and fourth alterations in original).]

In 2003, the Legislature adopted the Arbitration Act, which in most respects mirrors the Uniform Arbitration Act. *L.* 2003, *c.* 95. The Act, which exempts arbitration between employers and employees under collective bargaining agreements, *N.J.S.A.* 2A:23B–3(a), recognizes the contractual nature of the arbitration remedy and sets forth the details of the arbitration procedure that will apply unless varied or waived by contract, *N.J.S.A.* 2A:23B–4. Within the Act are specific provisions governing the arbitration

process, including those detailing the method for initiation of the proceedings, *N.J.S.A.* 2A:23B–9; the conduct of the arbitration process itself, *N.J.S.A.* 2A:23B–15; and the issuance of the award, *N.J.S.A.* 2A:23B–19. The Act prescribes standards for confirmation, *N.J.S.A.* 2A:23B–22; vacation, *N.J.S.A.* 2A:23B–23; and modification of an award, *N.J.S.A.* 2A:23B–24. Under the Act, a court will vacate an arbitration award only if:

(1) the award was procured by corruption, fraud, or other undue means;

(2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to section 15 of this act, so as to substantially prejudice the rights of a party to the arbitration proceeding;

(4) an arbitrator exceeded the arbitrator's powers;

(5) there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection pursuant to subsection c. of section 15 of this act not later than the beginning of the arbitration hearing; or

(6) the arbitration was conducted without proper notice of the initiation of an arbitration as required in section 9 of this act so as to substantially prejudice the rights of a party to the arbitration proceeding.

[*N.J.S.A.* 2A:23B–23(a) (footnotes omitted).]

■ A modification of the award may be ordered by the court if:

(1) there was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award;

(2) the arbitrator made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision upon the claims submitted; or

(3) the award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.

[*N.J.S.A.* 2A:23B–24(a).]

As can be seen from those provisions and, as might be expected, the scope of review of an arbitration award is narrow. Otherwise, the purpose of the arbitration contract, which is to provide an effective, expedient, and fair resolution of disputes, would be severely undermined. *Barcon Assocs., supra,* 86 *N.J.* at 187, 430 *A.2d* 214.

We note that there is no express bar to the arbitration of family law matters in the Arbitration Act. Further, in *Faherty v. Faherty*, we long ago approved the arbitration of some family law issues, alimony and child support in particular. 97 *N.J.* 99, 108–09, 477 *A.*2d 1257 (1984). There we reserved decision on the issue of arbitration of child-custody questions:

> While several states have enforced agreements to arbitrate child support disputes, arbitration of custody and visitation issues has been deemed to be an unacceptable infringement of the court's *parens patriae* role. We do not reach the question of whether arbitration of child custody and visitation rights is enforceable since that issue is not before us. However, we note that the development of a fair and workable mediation or arbitration process to resolve these issues may be more beneficial to the children of this state than the present system of courtroom confrontation. *See* Schepard, Philbrick & Rabino, *Ground Rules for Custody Mediation and Modification*, 48 *Alb. L.Rev.* 616 (1984). Accordingly, the policy reasons for our holding today with respect to child support may be equally applicable to child custody and visitation cases.
>
> [*Id.* at 100, 477 *A.*2d 1257.]

Today, the issue left open in *Faherty*—whether child-custody and parenting-time issues can be resolved by arbitration—is before us.

The legal landscape across the country has changed in the quarter century since *Faherty*, which was decided at a time when few, if any, jurisdictions allowed arbitration of child-custody disputes. Indeed, the majority of our sister states that have addressed the issue have concluded that parents are empowered to submit child-custody and parenting-time issues to arbitration in the exercise of their parental autonomy. *See, e.g., In re Marriage of Popack*, 998 *P.*2d 464, 469 (Colo.Ct.App.2000); *Dick v. Dick*, 210 *Mich.App.* 576, 534 *N.W.*2d 185, 190–91 (1995); *Miller v. Miller*, 423 *Pa.Super.* 162, 620 *A.*2d 1161, 1163–64 (1993).

We note as well that that conclusion has been urged by the bulk of scholarly writing on the subject. *See, e.g.,* Christine Albano, Comment, *Binding Arbitration: A Proper Forum for Child Custody?*, 14 *J. Am. Acad. Matrimonial Law.* 419 (1997); Joan F. Kessler et al., *Why Arbitrate Family Law Matters?*, 14 *J. Am. Acad. Matrimonial Law.* 333 (1997); Janet Maleson Spencer & Joseph P. Zammit, *Mediation–Arbitration: A Proposal for Private Resolution of Disputes Between Divorced or Separated Par-*

*ents*, 1976 *Duke L.J.* 911 (1976); E. Gary Spitko, *Reclaiming the "Creatures of the State": Contracting for Child Custody Decision-making in the Best Interests of the Family*, 57 *Wash. & Lee L.Rev.* 1139 (2000); Aaron E. Zurek, Note, *All the King's Horses and All the King's Men: The American Family after Troxel, the Parens Patriae Power of the State, A Mere Eggshell Against the Fundamental Right of Parents to Arbitrate Custody Disputes*, 27 *Hamline J. Pub.L. & Pol'y* 357 (2006).

Such scholarly support for child-custody arbitration recognizes that it has the potential to minimize the harmful effects of divorce litigation on both children and parents. As Professor Linda Elrod explained:

> Unlike a tort action where the issue is liability and the litigants may never cross paths again, a divorce legally ends a relationship between people who may not have separated emotionally and who must continue to interact as long as there are minor children.... The win/lose framework [of child-custody litigation] encourages parents to find fault with each other rather than to cooperate....
>
> In addition, unlike tort cases that end with a money judgment, issues regarding children remain modifiable throughout a child's minority, giving parents more opportunities to carry on a dispute.... The entire process becomes negative and expensive.
>
> [Linda D. Elrod, *Reforming the System to Protect Children in High Conflict Custody Cases*, 28 *Wm. Mitchell L.Rev.* 495, 501–02 (2001).]

On the other hand, "arbitration conducted in a less formal atmosphere, often in a shorter time span than a trial, and always with a fact-finder of the parties' own choosing, is often far less antagonistic and nasty than typical courthouse litigation." Kessler et al., *supra*, 14 *J. Am. Acad. Matrimonial Law.* at 343. In sum, the benefits of arbitration in the family law setting appear to be well established.

That is the backdrop for our inquiry.

## IV.

As the arguments of the parties make clear, although the stated issue before us is whether we should permit arbitration of child-custody issues, the case is really about the intersection between parents' fundamental liberty interest in the care, custody, and

control of their children, and the state's interest in the protection of those children.

The right to rear one's children is so deeply embedded in our history and culture that it has been identified as a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Wisconsin v. Yoder*, 406 *U.S.* 205, 232–33, 92 *S.Ct.* 1526, 1541–42, 32 *L.Ed.*2d 15, 35 (1972) (explaining "primary role" of parents in raising their children as "an enduring American tradition" and the Court's historical recognition of that right as fundamental). Although often expressed as a liberty interest, childrearing autonomy is rooted in the right to privacy. *See Prince v. Massachusetts*, 321 *U.S.* 158, 166, 64 *S.Ct.* 438, 442, 88 *L.Ed.* 645, 652 (1944) (observing existence of "private realm of family life which the state cannot enter"); *V.C. v. M.J.B.*, 163 *N.J.* 200, 218, 748 *A.2d* 539 (2000) (remarking that "the right of a legal parent to the care and custody of his or her child derives from the notion of privacy"), *cert. denied*, *M.J.B. v. V.C.*, 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L.Ed.*2d 243 (2000). Eighty years ago in *Meyer v. Nebraska*, the United States Supreme Court characterized the right of parents to bring up their children "as essential to the orderly pursuit of happiness by free men." 262 *U.S.* 390, 399, 43 *S.Ct.* 625, 626, 67 *L.Ed.* 1042, 1045 (1923) (citations omitted).

[*Moriarty v. Bradt*, 177 *N.J.* 84, 101, 827 *A.2d* 203 (2003), *cert. denied*, 540 *U.S.* 1177, 124 *S.Ct.* 1408, 158 *L.Ed.*2d 78 (2004).]

Indeed, the primary role of parents in the upbringing of their children is now established beyond debate as an enduring tradition to which we have unflinchingly given voice. *See, e.g., Yoder, supra,* 406 *U.S.* at 232–34, 92 *S.Ct.* at 1541–43, 32 *L.Ed.*2d at 35–36 (holding state could not force Amish child to remain in formal high school until age sixteen); *Pierce v. Soc'y of Sisters,* 268 *U.S.* 510, 534–35, 45 *S.Ct.* 571, 573, 69 *L.Ed.* 1070, 1078 (1925) (holding state could not require children to attend public school); *Meyer, supra,* 262 *U.S.* at 400–03, 43 *S.Ct.* at 626–28, 67 *L.Ed.* at 1045–47 (holding state could not criminalize teaching of German language to pupils who had not yet passed eighth grade); *Watkins v. Nelson,* 163 *N.J.* 235, 256, 748 *A.2d* 558 (2000) (holding in custody dispute between non-custodial father and parents of deceased custodial mother, non-custodial parent awarded custody unless harm shown).

Deference to parental autonomy means that the State does not second-guess parental decision making or interfere with the shared opinion of parents regarding how a child should be raised. Nor does it impose its own notion of a child's best interests on a

family. Rather, the State permits to stand unchallenged parental judgments that it might not have made or that could be characterized as unwise. That is because parental autonomy includes the "freedom to decide wrongly." Spencer & Zammit, *supra*, 1976 *Duke L.J.* at 913.

■ Nevertheless, "[t]he right of parents to the care and custody of their children is not absolute." *V.C.*, *supra*, 163 *N.J.* at 218, 748 *A.*2d 539; *Prince*, *supra*, 321 *U.S.* at 166–67, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652–53.

Thus, for example, our courts have overridden the desires of parents who refused to consent to medical treatment and ordered such treatment to save a child's life. *See Parham v. J.R.*, 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979) ("Nonetheless, we have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." (citations omitted)); *Prince*, *supra*, 321 *U.S.* at 166–67, 64 *S.Ct.* at 442, 88 *L.Ed.* at 652–53 (noting that state, as *parens patriae*, can intrude on parental autonomy to protect child from ill health or death); *Jehovah's Witnesses v. King County Hosp. Unit No. 1*, 278 *F.Supp.* 488, 498–99, 504–05 (W.D.Wash.1967) (holding Washington State statute that declared children to be dependents of state for purpose of authorizing blood transfusions against expressed wishes of parents was constitutional), *aff'd*, 390 *U.S.* 598, 88 *S.Ct.* 1260, 20 *L.Ed.*2d 158 (1968) (per curiam); *State v. Perricone*, 37 *N.J.* 463, 474, 181 *A.*2d 751 (finding state may act under its *parens patriae* authority to protect child's welfare by declaring him or her neglected to obtain necessary medical treatment), *cert. denied*, 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L.Ed.*2d 124 (1962); *Muhlenberg Hosp. v. Patterson*, 128 *N.J.Super.* 498, 503, 320 *A.*2d 518 (Law Div.1974) (ordering blood transfusion to infant over parents' wishes).

[*Moriarty*, *supra*, 177 *N.J.* at 102–03, 827 *A.*2d 203.]

■ Indeed, the state has an obligation, under the *parens patriae* doctrine,[3] to intervene where it is necessary to prevent

---

[3] *"Parens patriae"* means "parent of his or her country," and refers to "the state in its capacity as provider of protection to those unable to care for themselves," such as children. *Black's Law Dictionary* 1144 (8th ed. 2004). The doctrine has deep roots. Scholars trace it back to the Book of Genesis where God said to Cain of his brother Abel "[h]is desires shall be subject unto thee, and thou shalt rule over him." Zurek, *supra*, 27 *Hamline J. Pub.L. & Pol'y* at 377 (citing Robert Filmer, *Patriarcha: or the Natural Power of Kings* 19 (1680); *Genesis* 4:4–5). "The Roman Senate had the power to award the honorary title of *pater patriae* ('father of the fatherland') to the emperor in recognition of his great leadership." *Ibid.* (citing Stefan Weinstock, *Divus Julius* 200 (1971)).

harm to a child. *Ibid.* (citations omitted); *Prince, supra,* 321 *U.S.* at 169–70, 64 *S.Ct.* at 444, 88 *L.Ed.* at 654; *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 352, 736 *A.2d* 1246 (1999) ("The harm shown under the first prong [of the test for termination of parental rights] must be one that threatens the child's health and will likely have continuing deleterious effects on the child."); *see also N.J.S.A.* 30:4C–11 (stating that for child to be placed in care and custody of Division of Youth and Family Services, it must be shown "that the welfare of such child will be endangered unless proper care or custody is provided").

▇ The harm standard is clear. Indeed, in *Moriarty, supra,* we stated unequivocally that "interference with parental autonomy will be tolerated only to avoid harm to the health or welfare of a child." 177 *N.J.* at 115, 827 *A.2d* 203. There, a father had denied visitation to the parents of his deceased wife. *Id.* at 90–95, 827 *A.2d* 203. In ruling, we were called upon to consider the New Jersey Grandparent Visitation Statute, *N.J.S.A.* 9:2–7.1, which applied a best-interests standard in assessing a grandparent's application for visitation. We declared that:

> Our prior jurisprudence establishes clearly that the only state interest warranting the invocation of the State's *parens patriae* jurisdiction to overcome the presumption in favor of a parent's decision and to force grandparent visitation over the wishes of a fit parent is the avoidance of harm to the child. When no harm threatens a child's welfare, the State lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit. However, when harm is proved and the presumption in favor of a fit

King James I utilized the term when he told Parliament in the seventeenth century that the king is "truly *parens patriae,* the polite father of his people." *Id.* at 378 (quoting James I (James VI of Scotland), Speech to Parliament (March 21, 1610)). The obligation of the king to protect the lords of the manors and those under them was viewed as part of the father's responsibility. *See id.* at 378–79. Eventually, that power devolved upon the chancery court, which acted as a guardian of the mentally ill "and children who could not help themselves." *Id.* at 379. The doctrine was legislatively established in the early American colonies; in pre-Revolutionary America and the Plymouth Colony, the community was authorized to act when a parent neglected his or her child. *Id.* at 380 n. 88 (citing John Demos, *A Little Commonwealth: Family Life in Plymouth Colony* 105 (1970)).

parent's decision making is overcome, the court must decide the issue of an appropriate visitation schedule based on the child's best interests.

[*Moriarty, supra*, 177 *N.J.* at 114–15, 827 *A.*2d 203.]

Thus, we held that when a grandparent challenges a parent's decision regarding visitation, he or she must demonstrate, by a preponderance of the evidence, that the visitation "is necessary to avoid harm to the child." *Id.* at 117, 827 *A.*2d 203. That harm standard "is a constitutional necessity because a parent's right to family privacy and autonomy are at issue." *Id.* at 118, 827 *A.*2d 203. In short, potential harm to the child is the constitutional imperative that allows the State to intervene into the otherwise private and protected realm of parent-child relations.

### V.

The question then becomes whether the right to parental autonomy subsumes the right to submit issues of child custody and parenting time to an arbitrator for disposition. We think it does. As we have said, the entitlement to autonomous family privacy includes the fundamental right of parents to make decisions regarding custody, parenting time, health, education, and other child-welfare issues between themselves, without state interference. That right does not evaporate when an intact marriage breaks down. It is for that reason, as the parties conceded, that when matrimonial litigants reach a settlement on issues regarding child custody, support, and parenting time, as a practical matter the court does not inquire into the merits of the agreement. It is only when the parents cannot agree that the court becomes the default decision maker.

Indeed, Mr. Fawzy does not suggest otherwise. He recognizes that parental autonomy subsumes all child-custody and parenting-time questions and that so long as the parties agree, they can make decisions on those subjects between themselves without state interference. The only decision that he appears to carve out of that right to parental autonomy is the decision to submit child-custody and parenting-time matters to arbitration.

We see no basis for that exception. For us, the bundle of rights that the notion of parental autonomy sweeps in includes the right to decide how issues of custody and parenting time will be resolved. Indeed, we have no hesitation in concluding that, just as parents "choose" to decide issues of custody and parenting time among themselves without court intervention, they may opt to sidestep the judicial process and submit their dispute to an arbitrator whom they have chosen. We agree with legal commentators who have concluded that the right to arbitrate child custody and parenting time serves an important family value in that it:

> allows the parents the opportunity to choose an arbitrator for their custody dispute on the basis of her familiarity with the family or her understanding of the values that the parents hold dear and have tried to follow in raising their child. In such cases, one might reasonably anticipate that the arbitrator will reach a decision that is more in accord with the family's true needs, wants, and values than would a judge deciding the case in public custody litigation.
>
> [Spitko, *supra*, 57 *Wash. & Lee L.Rev.* at 1210.]

Likewise:

> To the extent that parents, even after a good faith effort, cannot agree between themselves on what is best for their children, they should at least have the right to choose the decision-maker and should not be compelled to accept an individual or committee chosen by the state whose values may significantly differ from their own.
>
> [Spencer & Zammit, *supra*, 1976 *Duke L.J.* at 918–19.]

In short, the constitutionally protected right to parental autonomy includes the right to submit any family controversy, including one regarding child custody and parenting time, to a decision maker chosen by the parents. To the extent that the Appellate Division ruled otherwise, its reasoning is disapproved.

## VI.

We turn then to the issue of the standard of review of a child-custody arbitration award. Relying on *Faherty*, Mr. Fawzy contends that we have already developed a template for judicial oversight of family law arbitration that requires a review de novo based on a best-interests-of-the-child standard, and that that is the standard we should adopt here.

Admittedly, the *Faherty* paradigm has confused the issue because of our references in the opinion to "best interests" and "substantial best interests." 97 *N.J.* at 110, 477 *A.*2d 1257. However, we are satisfied that Mr. Fawzy's reading of *Faherty* emphasizes the references to "best interests" at the expense of the broader holding that a further inquiry, beyond the narrow arbitration standard, is only required where the "substantial best interests" of the child are "adversely affect[ed]" by the award. *Ibid.* In our view, the language in *Faherty* was an effort to remain true to the constitutional "avoidance of harm to the child" standard of which the Court was certainly aware as a result of long-standing United States Supreme Court jurisprudence on the subject. *See, e.g., Prince, supra,* 321 *U.S.* at 169–70, 64 *S.Ct.* at 444, 88 *L.Ed.* at 654 (holding State may intervene in otherwise protected areas of parental autonomy where necessary to prevent harm to child).

It was for that reason that *Faherty, supra,* referenced not "best interests" but "substantial best interests" and, more importantly, used a synonym for harm—"adversely affect"—in its analysis. 97 *N.J.* at 110, 477 *A.*2d 1257. Under *Faherty,* the review of an arbitration award is to take place within the confines of the Arbitration Act, unless there is a claim of adverse impact or harm to the child. *Id.* at 109–10, 477 *A.*2d 1257. Only in that case will further review be required. *Ibid.* We reaffirm that standard today as in conformity with our long-standing jurisprudential principles that require deference to parental choices where they do not implicate harm to the child. *See, e.g., Moriarty, supra,* 177 *N.J.* at 115, 827 *A.*2d 203.

Put another way, where no harm to the child is threatened, there is no justification for the infringement on the parents' choice to be bound by the arbitrator's decision. In the absence of a claim of harm, the parties are limited to the remedies provided in the Arbitration Act. *See Faherty, supra,* 97 *N.J.* at 109–10, 477 *A.*2d 1257. On the contrary, where harm is claimed and a prima facie case advanced, the court must determine the harm issue. If no finding of harm ensues, the award will only be subject to

review under the Arbitration Act standard. If there is a finding of harm, the presumption in favor of the parents' choice of arbitration will be overcome and it will fall to the court to decide what is in the child's best interests. *See Moriarty, supra*, 177 *N.J.* at 115, 827 *A.*2d 203.

Mere disagreement with the arbitrator's decision obviously will not satisfy the harm standard. The threat of harm is a significantly higher burden than a best-interests analysis. Although each case is unique and fact intensive, by way of example, in a case of two fit parents, a party's challenge to an arbitrator's custody award because she would be "better" is not a claim of harm. Nor will the contention that a particular parenting-time schedule did not include enough summer vacation time be sufficient to pass muster. To the contrary, a party's claim that the arbitrator granted custody to a parent with serious substance abuse issues or a debilitating mental illness could raise the specter of harm. Obviously, evidential support establishing a prima facie case of harm will be required in order to trigger a hearing. Where the hearing yields a finding of harm, the court must set aside the arbitration award and decide the case anew, using the best-interests test.

We recognize that some other jurisdictions have approached the standard of review issue differently. For example, Pennsylvania has adopted a pure best-interests test for judicial review of an arbitrated custody award. *See Miller, supra*, 620 *A.*2d at 1165. We decline to adopt that model, which allows a court to substitute its judgment regarding the child's best interests for that of the arbitrator chosen by the parents and fails to accord the constitutionally required deference to the notion of parental autonomy. We do not perceive in that model the advancement of the goals underlying family or arbitration law.

In our view, the hybrid model we have adopted at once advances the purposes of arbitration by providing a final, speedy, and inexpensive resolution of the dispute; affords deference to parental decision making by allowing the parents to choose the person

who will resolve the matter; and leaves open the availability of court intervention where it is necessary to prevent harm to the child.

## VII.

Procedurally, a party aggrieved by an arbitrator's award regarding custody or parenting time must move pursuant to the Arbitration Act to vacate or modify the award. *N.J.S.A.* 2A:23B–23, 24. In the absence of a claim of harm to the child, the standards in the Act will apply. *See In re Arbitration Between Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc.,* 135 *N.J.* 349, 358, 640 *A.*2d 788 (1994) ("Because the record before us contains not even a hint of misconduct by the arbitrator, and because no statutory ground exists for invalidating or modifying the award, we uphold the arbitrator's award.").

The question of how a harm claim can be advanced within the arbitration matrix is a more difficult one in light of the fact that the Arbitration Act does not require a full record to be kept of arbitration proceedings. Nor does it compel the recordation of testimony or a statement by the arbitrator of his findings and conclusions beyond the issuance of an award, *N.J.S.A.* 2A:23B–19(a), although parties are free to agree upon other procedures, *see N.J.S.A.* 2A:23B–4. Because we do not discern that an empty arbitration record can supply any basis on which to evaluate a party's claim that the award threatens harm to the child, and in order to avoid a complete replay of the arbitration proceedings, we will require more than that in child-custody cases.

We therefore direct that when parties in a dissolution proceeding agree to arbitrate their dispute, the general rules governing the conduct of arbitration shall apply, *N.J.S.A.* 2A:23B–1 to –32. However, in respect of child-custody and parenting-time issues only, a record of all documentary evidence shall be kept; all testimony shall be recorded verbatim; and the arbitrator shall state in writing or otherwise record his or her findings of fact and conclusions of law with a focus on the best-interests standard. It

is only upon such a record that an evaluation of the threat of harm can take place without an entirely new trial. Any arbitration award regarding child-custody and parenting-time issues that results from procedures other than those that we have mandated will be subject to vacation upon motion.[4]

Although we recognize that those standards may increase, to a minimal extent, the cost of arbitration, we presume that experienced family law arbitrators have already incorporated some, if not all, of those procedures in order to create an evaluative baseline for judicial review in the case of the ubiquitous changed-circumstances motion. Moreover, we do not anticipate a new cottage industry of post-arbitration litigation. Indeed, it seems to us that parties engaged in a highly contentious struggle over custody and parenting time will be unlikely to agree upon arbitration in the first instance. Where the parties have been sufficiently cooperative to agree to arbitration and to choose an arbitrator who reflects their own values, we expect that they will be more, not less, likely to be satisfied with the outcome.

## VIII.

We turn finally to the question of how parents may exercise their rights and bind themselves to arbitrate a child-custody dispute. Reflecting the fact that arbitration "is, at its heart, a creature of contract," *Kimm, supra,* 388 *N.J.Super.* at 25, 905 *A.*2d 887, the Arbitration Act provides that: "[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract," *N.J.S.A.* 2A:23B–6(a).

---

[4] Consonant with our holding, Michigan also mandates that "[a] record shall be made of that portion of [an arbitration] hearing that concerns child support, custody, or parenting time in the same manner required by the Michigan court rules for the record of a witness's testimony in a deposition." *Mich. Comp. Laws* 600.5077(2); *Mich. Court Rule* 2.306(C)(2), (3).

The Act defines a record necessary to establish an agreement to arbitrate as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." *N.J.S.A.* 2A:23B–1. Thus, at a minimum, an agreement to arbitrate must be in writing or recorded in accordance with the requirements of *N.J.S.A.* 2A:23B–1. In addition, it must state in clear and unmistakable language: (1) that the parties understand their entitlement to a judicial adjudication of their dispute and are willing to waive that right; (2) that the parties are aware of the limited circumstances under which a challenge to the arbitration award may be advanced and agree to those limitations;[5] (3) that the parties have had sufficient time to consider the implications of their decision to arbitrate; and (4) that the parties have entered into the arbitration agreement freely and voluntarily, after due consideration of the consequences of doing so.

It goes without saying that parties are not bound to arbitrate on an all-or-nothing basis, but may choose to submit discrete issues to the arbitrator. The arbitration agreement should reflect, with specificity, which issues are to be subject to an arbitrator's decision. We commend to the Supreme Court Committee on Family Practice the development of form agreements and scripts for use by lawyers and judges in cases in which the parties seek to bind themselves to arbitration in family law matters.

### IX.

Applying the standards we have enunciated to the facts of this case, we are satisfied that the agreement to arbitrate was insufficient to bind the parties. Although both Mr. and Mrs.

---

[5] The parties may agree to a broader review than provided for by the default provisions in the Arbitration Act. *See N.J.S.A.* 2A:23B–4. In such a case, the agreement shall accurately reflect the circumstances under which a party may challenge the award and the level of review agreed upon.

Fawzy responded affirmatively to questions regarding their agreement, the nature of what was spread upon the record was inadequate to assure that they fully understood the consequences of removing their custody dispute from the judicial arena and into binding arbitration.

As we have said, there was no written arbitration agreement. Thus, the colloquy on the record had to establish that the parties understood their rights, knew what they were waiving, and especially that they were aware of what review was available. As is evident from the colloquy, that did not occur here. Although the judge fully explained "changed circumstances," which does not implicate the narrow arbitration standard of review, he did not as fully explain the parties' statutorily limited ability to challenge the award without such a change. Nor did he allude to the particular standards under which modification or vacation of the award would be allowed, or what other standards would warrant judicial intervention. Further, he erred in suggesting that bias on the part of the arbitrator would not be a basis for challenge under the Arbitration Act. *See N.J.S.A.* 2A:23B–23(a)(2).

To be fair, the judge, who did not have the benefit of this opinion, most likely thought that all the details of the arbitration had been worked out and explained by the lawyers, and indeed, they might have been. We simply cannot tell from the record whether that is so. Thus, lacking a basis on which to conclude that the Fawzys understood what they were relinquishing by opting for arbitration, we cannot say that they agreed to arbitrate their custody dispute. Accordingly, we affirm the judgment of the Appellate Division overturning the arbitration award, but not for the reasons the panel expressed.

Contrary to the Appellate Division's view, and as we have concluded, pursuant to notions of parental autonomy, parties in a matrimonial litigation are empowered to agree upon arbitration as a way of resolving their differences over child custody and rearing. Here that power was imperfectly exercised and thus the arbitration award cannot stand.

## X.

 We turn finally to the question of whether a guardian ad litem is empowered to serve as an arbitrator. Because this case is being remanded for the vacation of the arbitration award and for further judicial proceedings, the Appellate Division did not address that issue, which is technically moot. We nevertheless take this opportunity to comment briefly on the matter.

*Rule* 5:8B(a) permits a judge to appoint a guardian ad litem in a dispute between parties regarding custody and parenting time. Under the rule, the guardian ad litem renders service "to the court on behalf of the child," must be available to testify and, like any other witness, is subject to cross-examination. *Ibid.* Obviously, where an arbitrator is substituted for the judge, he cannot simultaneously function as guardian ad litem because the same party cannot be both a witness and an adjudicator.

In this case, Busch became the arbitrator after he had already served as the guardian ad litem and we assume that he did not continue in the latter role. Although that sequence of events may not present the particular conflict that flows from one party simultaneously holding both positions, it presents a set of problems of its own.

First, we note that an arbitrator, like a judge, is supposed to rule based on the evidence adduced by the parties during the arbitration proceedings and not on information that he has privately gleaned from other sources. Where, in his role as guardian ad litem, one who is later chosen to arbitrate has personally investigated the matter, he may be privy to facts about which the parties have no knowledge and which thus have not been tested in the crucible of cross-examination. That is a confounding factor in the exercise of the judicial role.

Moreover, to the extent that the guardian ad litem has interacted with the parties during his investigation or made preliminary reports to the court, he may be subject, if he later becomes the

arbitrator, to a claim of partiality under *N.J.S.A.* 2A:23B–23(a).[6] Finally, if one individual is permitted sequentially to wear the two hats of guardian ad litem and arbitrator, a conflict may arise insofar as the guardian ad litem must testify if, for some reason the case goes back to court, whereas *N.J.S.A.* 2A:23B–14 specifically prohibits the arbitrator from becoming a witness except in the narrow circumstance of a challenge based on corruption, fraud, or undue means.

In light of the foregoing, and given the universe of potential arbitrators, we think it obvious that a guardian ad litem should not be tapped to fulfill both roles either simultaneously or sequentially.

## XI.

The judgment of the Appellate Division is affirmed for the reasons to which we have adverted. The matter shall be handled expeditiously by the trial judge who will decide all outstanding issues.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

---

[6] There is no suggestion in this record that any of Busch's actions in the matter were, in any manner, untoward.