77 A.3d 1189

BARBARA MINKOWITZ, PLAINTIFF–APPELLANT, v.
RON S. ISRAELI, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 30, 2013—Decided September 25, 2013.

112

116

Before Judges MESSANO, LIHOTZ and OSTRER.

*Karin Duchin Haber* argued the cause for appellant (*Haber Silver & Simpson,* attorneys; *Ms. Haber,* of counsel; *Jani Wase Vinick,* on the brief).

*Nancy C. Richmond* argued the cause for respondent (*Ceconi & Cheifetz, LLC,* attorneys; *Cary Cheifetz,* of counsel, *Ms. Richmond,* on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

This matter considers what role, if any, the Family Part should play after parties in a matrimonial action agree to submit their disputes to binding arbitration and whether the arbitrator, having

first mediated disputes, may thereafter resume the role of arbitrator. Following the commencement of divorce proceedings, plaintiff Barbara Minkowitz and defendant Ron Israeli agreed to forgo judicial determination of all financial issues in favor of binding arbitration and agreed all custody and parenting time issues would be reviewed in non-binding arbitration. The parties consented to engage a single arbitrator and a jointly chosen forensic accounting expert. After the arbitrator met with them, but prior to the commencement of arbitration proceedings, the parties opted to engage in settlement discussions and mediation to narrow the issues for final determination. As matters were resolved, written documents incorporating the parties' understanding were prepared. After more than one year had elapsed and a majority of their disagreements were settled without commencement of an arbitration hearing, plaintiff retained new counsel, who sought the underlying documentation supporting the financial agreements. The request was declined and, thereafter, plaintiff moved before the arbitrator for release of the documents. He barred release and counsel re-filed the requests before the Family Part. The Family Part judge generally denied the motions and ultimately confirmed the "arbitration awards" as final judgments.

On appeal, plaintiff challenges five separate orders confirming arbitration awards. She maintains each must be set aside under *N.J.S.A.* 2A:23B–23 or, alternatively, requests the final judgment of divorce be vacated, pursuant to *Rule* 4:50–1. Plaintiff argues procedural violations, the arbitrator's bias and substantive errors caused an unconscionable result, which cannot stand.

Following our review, we affirm the orders confirming the settlement agreements reached by the parties. However, we conclude once the arbitrator functioned as a mediator, he may not then conduct arbitration hearings. Consequently, we vacate those orders confirming substantive arbitration awards issued subsequent to the parties' execution of the mediated agreements. The matter is remanded to the Family Part for the parties to select a new arbitrator, who will conduct a binding arbitration hearing on

any remaining financial disagreements. We also conclude under the terms of the parties' arbitration agreement, plaintiff has an entitlement to the requested documentation, the provision of which shall be addressed by the new arbitrator, once appointed.

## I.

Plaintiff filed her complaint for divorce on March 18, 2008, after fourteen years of marriage. The parties have two children who are now teenagers.

The parties executed an agreement engaging a designated arbitrator, to "arbitrate the matter" and "render a written opinion incorporating his findings and conclusions of law in support of the award[.]" The arbitration agreement provided, in pertinent part:

1. The issues to be arbitrated shall be identified by the parties and placed on the record prior to the commencement of any hearing. The record will further reflect those issues that are being submitted to nonbinding, as distinguished from binding, arbitration.

. . . .

7. The Arbitrator shall have the power to issue subpoenas and to order depositions or other discovery in accordance with the provisions of *N.J.S.A.* 2A:23B–17.

8. The [A]rbitrator shall have the power to order equitable remedies, if appropriate, unless the parties agree otherwise, in writing.

. . . .

10. Unless waived by the parties, in writing, the Arbitrator shall render a written opinion incorporating his findings and conclusions of law in support of the award.

. . . .

13. The Agreement shall be subject to the Arbitration Act[,] . . . *N.J.S.A.* 2A:23B–1 to –32[ ].

Attached to the three-page arbitration agreement was a two-page document, which the parties also signed, entitled "STATE-MENT OF RIGHTS AND RESPONSIBILITIES OF ARBI-TRATING PERSONS." Among the rights listed was "[a]rbitrating [p]ersons have the right to be provided copies of all documents presented to the [a]rbitrator by their spouse."

The parties and their respective counsel also executed a consent order, filed with the Family Part, memorializing the agreement to arbitrate. The order reiterated those issues submitted to binding and non-binding arbitration; recited the designated arbitrator and payment of his retainer; and allocated the party's respective obligations for future payment of arbitration fees and costs. Finally, the order directed the arbitrator to schedule a "preliminary [c]ase [m]anagement [c]onference with the parties and the [c]ourt-appointed accountant" and, concurrently, set "a case management date ... with the court for ... September 3, 2008." The parties mutually stipulated and the court subsequently appointed Seymour Rubin of Rubin–Goertz & Company as their "joint forensic accounting" expert.

Although the arbitrator had been appointed and met with the parties, they filed a joint application before the Family Part seeking a protective order, which prescribed "[c]onfidential [m]aterial" could be disclosed only to the parties, their attorneys, their attorneys' respective staff, Rubin, the arbitrator, and the court. The protective order filed on January 27, 2009, defined "confidential material" as "information pertaining to ... parties and/or all entities" listed on an attached schedule, which included the parties' business interests.

The arbitrator met with the parties and their attorneys in August 2008. Thereafter, counsel and the parties' respective accountants, but not the parties themselves, conferenced to review Rubin's financial evaluations. The parties chose to defer commencement of arbitration, pending efforts to settle some disputes. The parties, their counsel, Rubin, and at times, the arbitrator discussed their respective positions and submitted documentation. Rubin would offer a recommendation regarding resolution, and, if the parties accepted, a written agreement would be prepared. Following this process, the parties executed four agreements in 2009, which we collectively refer to as the 2009 agreements.

The first of the 2009 agreements, reached in February 2009, was presented to the Family Part via a consent order. The April

1, 2009 order simply stated: "The [a]rbitration [c]onsent [o]rder as to [e]quitable [d]istribution of [m]edical [p]ractices, attached hereto, is hereby incorporated herein and made a part hereof[,] and shall have the full force and effect of an [o]rder of this [c]ourt." The "arbitration consent order" included the Superior Court caption, but was signed by the arbitrator, the parties and counsel, and provided:

Each party on the recommendation of the joint forensic accounting expert ... Rubin ... and after discussions with their respective counsel agree that he and she shall waive any right, title and/or interest ... in the medical practice of the other party and each party shall retain their own respective medical practice(s) free and clear of any claim by the other.

The "arbitration consent order" also stated it "shall be incorporated into any [p]roperty [s]ettlement [a]greement and/or [j]udgment of [d]ivorce entered into by the parties and the [c]ourt."

Informal discussions continued with an eye toward resolving the parties' respective claims for equitable distribution. On July 8, 2009, the parties executed their second agreement, a "MEMORANDUM OF UNDERSTANDING," which provided:

This memorandum ... shall describe the outline of an Agreement that was reached between the parties ... after mediation with the assistance of ... "the [a]rbitrator" and Seymour Rubin, C.P.A.

It is understood that this Memorandum shall be binding with respect to the issues recited herein, although a formal Agreement will be prepared and subsequently executed.

This Memorandum is the result of many months of negotiations and many conferences with [the arbitrator] and Mr. Rubin. The parties are entering into this Memorandum freely and voluntarily after conferring with their attorneys and anyone else with whom they wish to confer. The parties agree that this Memorandum represents a fair compromise of the issues. They acknowledge that by entering into this Memorandum, they are waiving their rights to participate in Arbitration hearings and waive the right to have the issues set forth in this Memorandum decided by the Arbitrator.

In this agreement, the parties restated the confidentiality of the financial disclosures; mutually waived alimony, and fixed child support; divided household furnishings, disposed and distributed various realty, retirement assets, stock and bank accounts, divided other joint assets; agreed to "pay their own counsel fees[,]" "equally share" the fees of the arbitrator and Rubin; and waived

present and future claims for "prior, present or future claims" against one another. In the event of any further disputes, the memorandum required "written presentations from each attorney" to be submitted to the arbitrator.

Defendant's counsel prepared a draft of a proposed property settlement agreement (PSA), purportedly memorializing the parties' agreements reached on the identified issues. However, a disagreement regarding the value and disposition of the former marital home occurred, which was resolved consensually in a three-page handwritten "Amendment to Memorandum of Understanding" dated September 22, 2009, the parties' third agreement. Next, a conference call, conducted by the arbitrator, settled 2008 tax issues, the terms of which were included in a memorandum of agreement dated October 15, 2009, which represents the fourth agreement.

Plaintiff hired co-counsel to assist in drafting and finalizing the PSA. She corresponded with Rubin explaining her role and requesting a meeting "to review his forensic findings," which served as the underpinnings of the parties' agreements. Defendant objected, claiming all matters were settled, except for relatively minor financial concerns. In a series of letters, Rubin consulted the arbitrator, who advised against his meeting with co-counsel, absent a formal application. On behalf of plaintiff, co-counsel wrote to the arbitrator requesting Rubin be instructed to meet with her and plaintiff "to review the financial information and compilation of forensic information and analyses" prepared by him. The arbitrator denied plaintiff's request to meet with Rubin in a letter dated November 23, 2009, advising:

> Prior to the execution of the [m]emorandum of [u]nderstanding and the [a]mendment thereto, Mr. Rubin spent many hours discussing the financial and property issues with [plaintiff's original counsel, plaintiff] and her accountant (as he did with [defendant's counsel, defendant] and his accountant).... [Plaintiff's original counsel] and your client's accountant should be able to explain the reasons why the issues recited in both agreements were resolved to the satisfaction of both parties.
>
> Mr. Rubin has already reviewed his forensic findings in great detail with [plaintiff's original counsel, plaintiff] and her accountant.

At this point, plaintiff's original counsel filed an application before the Family Part to substitute co-counsel as plaintiff's representative and requested he be relieved. Plaintiff then moved before the Family Part for an order requiring Rubin's production of all evaluations of the parties' respective incomes and/or cash flow prepared "in accordance with the [p]rotective [c]onsent [o]rder entered in this matter." On the return date, substituted counsel, now acting as plaintiff's attorney, challenged the lack of disclosure provided to her and argued the 2009 agreements were "invalid." The Family Part judge dismissed the motion stating, "[t]he parties ha[d] previously agreed that all financial aspects [we]re subject to binding arbitration. Any application seeking to modify this agreement must be made to the agreed upon arbitrator." Later that afternoon, the parties reached a settlement on custody and parenting time, which was placed on the record.

A consent dual judgment of divorce (JOD) was filed on March 8, 2010. The JOD specifically referenced and incorporated the parties' custody and parenting time agreement, set forth a timeline for resolving remaining financial issues, and noted any subsequent confirmed arbitration awards would be incorporated into the JOD, nunc pro tunc. Finally, plaintiff's demand for the production of financial documents was referred to the arbitrator.

As provided in the JOD, plaintiff filed a motion before the arbitrator, using the Family Part caption, seeking his recusal, or alternatively, requiring production of Rubin's financial documents, including reports regarding the parties' respective incomes and/or cash flow. Plaintiff's supporting certification inferred bias, stating the arbitrator had acted as both mediator and arbitrator throughout the proceeding. She also explained her need to obtain copies of Rubin's underlying documentation and attached a certification from her accountant, asserting the meeting with Rubin did not allow sufficient time to review the calculations or the underlying documentation.

Defendant opposed plaintiff's requests and filed a cross-motion for payment of attorney's fees. He included certifications from his

accountant, who refuted the characterization of the Rubin meetings. Rubin also filed a certification challenging facts asserted by plaintiff. He avowed the conference resulting in the agreement to distribute the medical practices lasted more than two-and-one-half hours, during which he presented "a detailed analysis of the federal income tax returns for the calendar years 2003, 2004, 2005 and 2006 as filed jointly by [the parties]."

An April 27, 2010 arbitration hearing addressed the issues raised in the cross-motions. In his decision, later incorporated in a May 25, 2010 award, the arbitrator denied plaintiff's application for recusal, explaining: "My role ... was to make recommendations, when requested, on the various financial issues.... At no time did I assume the role of mediator. I did not participate in the discussions of the financial information." The arbitrator rejected plaintiff's contention she was denied sufficient information to knowledgeably make the decisions set forth in the 2009 agreements, quoting extensively from correspondence sent by her former counsel. The arbitrator also drew an adverse inference because plaintiff had not included a certification from former counsel, who the arbitrator found interacted directly with Rubin and participated in the conferences.

Plaintiff returned to the Family Part seeking to set aside the May 25, 2010 arbitration order, requesting the same relief denied by the arbitrator. Defendant opposed plaintiff's motion in all respects and moved to disqualify counsel, confirm the May 25, 2010 arbitration order, and finalize outstanding issues.

On July 16, 2010, the trial court entered an order summarily denying plaintiff's motion in its entirety, denying defendant's cross-motion to disqualify counsel and confirming the May 25, 2010 arbitration decision. Plaintiff moved for reconsideration, which was summarily denied.

The parties returned to arbitration. In a November 10, 2010 proceeding conducted by the arbitrator, the parties agreed to a proposed allocation of debits and credits as computed by Rubin. Also, Rubin testified as to his proposed net distribution of assets

based on the 2009 agreements. The arbitrator stopped plaintiff's cross-examination of Rubin, when he determined she attempted to open the issues resolved by the 2009 agreements. During these proceedings, defendant requested a reduction in the amount of his child support, claiming plaintiff no longer incurred child care and counseling costs. Plaintiff objected, asserting defendant failed to show any change of circumstances because the underlying calculation of the child support award and his current income were not disclosed. Finalization of the issue was adjourned pending additional submissions.

On December 10, 2010, for the first time, Rubin agreed to meet with plaintiff, her counsel, her accountant and Thomas Hoberman, plaintiff's newly hired forensic accounting expert. Following the meeting Hoberman prepared a report, challenging Rubin's findings regarding plaintiff's projected 2008 income and identifying errors in his analysis.

The arbitrator corresponded with the parties, who had not complied with his directions for further submissions. More specifically, neither party had filed proposed resolutions regarding the outstanding property issues, and defendant had not submitted information supporting his child support modification request. Shortly thereafter, plaintiff renewed her demand for the arbitrator to recuse himself, this time claiming he engaged in ex parte communications with Rubin, in violation of *Rule* 5:3–3(e).[1]

In a decision letter, the arbitrator provided a procedure for distributing personalty, noting neither party provided proof of value. He denied plaintiff's request to set aside the 2009 agreements, stating his "communications with Mr. Rubin have been limited to scheduling issues and most recently to correct a factual

---

[1] *Rule* 5:3–3(e) provides "[t]he expert shall not communicate with the court except upon prior notice to the parties and their attorneys who shall be afforded an opportunity to be present and to be heard during any such communication between the expert and the court." However, nothing in the retainer agreement prohibits the expert's communication with the arbitrator, and, in fact, the agreement expressly permits discretionary rule relaxation.

error[.]" The arbitrator noted defendant had withdrawn his child support modification request; however, he ordered each party to address the basis for the award's deviation from the child support guidelines. Defendant responded; plaintiff renewed her request to set aside the 2009 agreements. The arbitrator, after reading certifications, made "credibility determinations" and adopted defendant's explanation of the calculation of the amount of support, Rubin's recommendation for proposed credits and allocation of debts. In doing so, the arbitrator again drew an adverse inference from plaintiff's omission of the certification of prior counsel regarding his participation in the Rubin conferences. The arbitrator relied on prior counsel's correspondence sent on behalf of plaintiff, wherein the parties relinquished "any equitable distribution claims against their respective practices only." The arbitrator again reserved finalization of the allocation of fees and costs.

Rubin submitted a certification supporting the calculation of child support, reporting he met with the parties and their attorneys in the arbitrator's office on June 24, 2009 (the arbitrator was not present). At that time, Rubin made adjustments to the income figures supplied by the parties' accountants, calculating plaintiff's and defendant's 2008 incomes. Rubin found defendant's annual salary from all sources exceeded plaintiff's by less than $5000. Rubin attached the schedules he had prepared and discussed with the parties at that conference. The schedules were used to fix defendant's child support obligation and promote the mutual waiver of alimony. Plaintiff again requested the 2009 agreements be voided and discovery reopened based on Hoberman's March 2, 2011 letter, which rebutted Rubin's methodology used to calculate plaintiff's projected 2008 income. After correcting what he asserted were errors, Hoberman concluded plaintiff's projected 2008 income would be less than half the sum Rubin calculated.

On March 17, 2011, the arbitrator entered an arbitration order incorporating the parties' 2009 agreements, Rubin's spreadsheets calculating debits and credits, and the income schedules Rubin

prepared supporting the calculation of child support, all of which were attached to the order. The order also directed "the final [a]rbitration [a]wards/[d]ecision shall be incorporated into an [a]mended [JOD], effective nunc pro tunc to February 4, 2010." The arbitrator reserved determination of any allocation of counsel, expert, and arbitration fees, pending further submissions by the parties. A subsequent agreement resolved distribution of personal property which also was incorporated in the JOD.

Plaintiff continued to press her request to vacate the 2009 agreements along with the arbitration orders. Relying on the certification of defendant's ex-fiancée, Jamie Silverman, plaintiff believed Rubin was not objective and had been aiding defendant. Silverman certified defendant "advised" he actually earned almost twice the sum Rubin had calculated and frequently spoke with Rubin, whom he allegedly referred to as "Uncle Seymour." Further, Silverman reportedly overheard a telephone conversation between defendant and Rubin, after which defendant informed her Rubin "was going to make sure everything was 'taken care of. . . . [A] little birdie told me Seymour got it covered.'" Plaintiff sought to subpoena records of Rubin's telephone communications with defendant.

Defendant opposed the application and cross-moved for an order requiring plaintiff to "pay 100 percent of the counsel fees and costs incurred by ... defendant for having to respond." Rubin also submitted a certification denying plaintiff's allegations of bias, refuting the suggestion he merely accepted defendant's assertions. He explained "[defendant] supplied voluminous credit card information to me for the five years preceding the date of the complaint[.]"

The arbitrator issued a decision on July 1, 2011. He found Silverman "[wa]s not completely objective[,]" given her recent break-up with defendant, whereas Rubin was "selected as a neutral accountant by both parties[,]" had "no apparent dog in the race," and had as many private conversations with plaintiff as with defendant. The arbitrator rejected plaintiff's claims and reserved

his decision on defendant's fee request. Plaintiff subsequently moved for reconsideration, relying on certifications from plaintiff's accountant and Hoberman. Defendant opposed the request and reasserted his demand for payment of his fees. The arbitrator denied plaintiff's motion for reconsideration.

In a separate submission the arbitrator addressed the allocation of fees. Finding "both parties have the income, ability and financial resources to pay counsel and expert fees and the costs of arbitration[,]" the arbitrator held each party responsible for his and her own fees, as well as "50% of the arbitration fees incurred ... and 50% of Mr. Rubin's fees ... as of December 1, 2009." However, as for fees incurred after December 1, 2009, the arbitrator found plaintiff "conducted her ... litigation in bad faith" and repeatedly asserted unreasonable positions, which warranted an award to defendant in order to protect him from the costs of unnecessary litigation. The arbitrator allocated $37,000 of Rubin's post-December 1, 2009 fees to plaintiff, and $9,281.25 to defendant. Further, he awarded defendant $50,000 for his attorney's work after December 1, 2009, to be paid by plaintiff.

Defendant moved before the Family Part to confirm the March 17, 2011 arbitration award. Plaintiff cross-moved to vacate the award and all underlying agreements that were incorporated therein. She further requested to terminate services by the arbitrator and Rubin, to reopen discovery, and to select a new arbitrator and expert to "commence de novo arbitration of all financial issues[.]" The judge granted defendant's motion to confirm the March 17, 2011 award and denied plaintiff's cross-motion in a November 30, 2011 order. A separate motion to confirm the arbitrator's August 11, 2011 fee award was filed and granted, over plaintiff's objection. In a November 30, 2011 order, the judge also declined plaintiff's motion to stay enforcement pending her appeal and denied defendant's motion for an additional fee award.

On appeal, plaintiff requests we reverse the orders by the court confirming the May 25, 2010, March 17, 2011, and August 11, 2011

awards by the arbitrator, whom she maintains committed misconduct, displayed partiality, and exceeded the scope of arbitral authority.

## II.

Neither party contests the consensual agreement to submit all financial disputes to binding arbitration. The record supports the parties clearly opted out of judicial review of their matrimonial matter in favor of arbitration. The proceeding's emphasis on confidentiality, coupled with defendant's resistance to release of income information, suggest a motive to maintain financial secrecy.

On appeal, plaintiff seeks to vacate the arbitration awards and the orders confirming them, emphasizing procedural defects during proceedings conducted by the arbitrator infected the fundamental fairness of the process and resulted in an unconscionable outcome. Before we examine plaintiff's challenges, we need to consider the arbitral forum choice, governed by the Revised Uniform Arbitration Act (the Act), *N.J.S.A.* 2A:23B–1 to –32.

"In New Jersey, arbitration ... is a favored means of dispute resolution." *Hojnowski v. Vans Skate Park,* 187 *N.J.* 323, 342, 901 *A.*2d 381 (2006). It is well-settled that New Jersey's strong public policy favors settlement of disputes through arbitration. *Id.* at 343, 901 *A.*2d 381; *see also Block v. Plosia,* 390 *N.J.Super.* 543, 551, 916 *A.*2d 475 (App.Div.2007) (stating the Act "continues our state's long-standing policy to favor voluntary arbitration as a means of dispute resolution"). Increasingly, parties elect "to side step the judicial process" and enter arbitration agreements in a myriad of areas other than labor-management disputes. *Fawzy v. Fawzy,* 199 *N.J.* 456, 477, 973 *A.*2d 347 (2009). *See also Wein v. Morris,* 194 *N.J.* 364, 375–76, 944 *A.*2d 642 (2008) ("Our courts have long noted our public policy that encourages the use of arbitration proceedings as an alternate forum.") (internal quotation marks and citation omitted).

In *Fawzy*, the Supreme Court reinforced the benefits of using arbitration in family litigation, which the Court first discussed in *Faherty v. Faherty*, 97 *N.J.* 99, 477 *A.*2d 1257 (1984). In *Faherty*, the question considered was the enforceability of an arbitration clause in a separation agreement. *Id.* at 105, 477 *A.*2d 1257. The Court concluded:

> It is fair and reasonable that parties who have agreed to be bound by arbitration in a formal, written separation agreement should be so bound. Rather than frowning on arbitration of alimony disputes, public policy supports it. We recognize that in many cases arbitration of matrimonial disputes may offer an effective alternative method of dispute resolution.
>
> [*Faherty, supra,* 97 *N.J.* at 107, 477 *A.*2d 1257.]

A significant advantage of arbitration, likely the controlling motivation in this matter, is "the opportunity for resolution of sensitive matters in a private and informal forum," rather than presentation of the matter in the public arena of an open courtroom. *Id.* at 107–08, 477 *A.*2d 1257. The Court observed:

> arbitration conducted in a less formal atmosphere, often in a shorter time span than a trial, and always with a fact-finder of the parties' own choosing, is often far less antagonistic and nasty than typical courthouse litigation. In sum, the benefits of arbitration in the family law setting appear to be well established.
>
> [*Fawzy, supra,* 199 *N.J.* at 472, 973 *A.*2d 347 (internal quotation marks and citation omitted).]

" 'The object of arbitration is the final disposition, in a speedy, inexpensive, expeditious, and perhaps less formal manner, of the controversial differences between the parties.' " *Hojnowski, supra,* 187 *N.J.* at 343, 901 *A.*2d 381 (quoting *Carpenter v. Bloomer,* 54 *N.J.Super.* 157, 162, 148 *A.*2d 497 (App.Div.1959)).

Arbitration is a "creature of contract[.]" *Kimm v. Blisset, LLC,* 388 *N.J.Super.* 14, 25, 905 *A.*2d 887 (App.Div.2006) (citations omitted), *certif. denied,* 189 *N.J.* 428, 915 *A.*2d 1051 (2007). Like its federal counterpart, the Federal Arbitration Act (FAA), 9 *U.S.C.A.* § 1–16, the Act strives for uniformity. *See N.J.S.A.* 2A:23B–29 ("In applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among States that enact it."). Accordingly, the Act "recognizes the contractual nature of

the arbitration remedy and sets forth the details of the arbitration procedure that will apply unless varied or waived by contract, *N.J.S.A.* 2A:23B–4." *Fawzy, supra,* 199 *N.J.* at 469, 973 *A.*2d 347. It is understood that "when parties in dissolution proceedings agree to arbitrate their dispute, the general rules governing the conduct of arbitration shall apply, *N.J.S.A.* 2A:23B–1 to –32." *Id.* at 480, 973 *A.*2d 347. Accordingly, " 'only those issues may be arbitrated which the parties have agreed shall be.' " *Id.* at 469, 973 *A.*2d 347 (quoting *In re Arbitration Between Grover & Universal Underwriters Ins. Co.,* 80 *N.J.* 221, 229, 403 *A.*2d 448 (1979)).

The written arbitration agreement may, subject to the restriction of *N.J.S.A.* 2A:23B–4b, define the arbitration procedures, including the method for initiation of arbitration proceedings, *N.J.S.A.* 2A:23B–9; the manner the process is conducted, *N.J.S.A.* 2A:23B–15; and the issuance of the award, *N.J.S.A.* 2A:23B–19. The Act authorizes courts to recognize and enforce arbitration agreements. *N.J.S.A.* 2A:23B–5, –6; *Spaeth v. Srinivasan,* 403 *N.J.Super.* 508, 513, 959 *A.*2d 290 (App.Div.2008). In adopting the Act, the Legislature intended to follow the FAA, "which states that arbitration agreements 'shall be valid[,] irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' " *Id.* at 513 n. 1, 959 *A.*2d 290 (quoting 9 *U.S.C.A.* § 2).

█ Further, as discussed in detail below, once parties agree to proceed in an arbitral forum, the court's role is significantly narrowed. *Fawzy, supra,* 199 *N.J.* at 462, 470, 973 *A.*2d 347. Although, pending the arbitrator's appointment, the court may act provisionally to address "urgent" relief, *see N.J.S.A.* 2A:23B–8b(2), "[a]fter an arbitrator is appointed and is authorized and able to act," it is the arbitrator who

> may issue orders for provisional remedies, including interim awards, as ... necessary to protect the effectiveness of the arbitration proceeding and to promote the fair and expeditious resolution of the controversy, to the same extent and pursuant to the same conditions as if the controversy were the subject of a civil action[.]
>
> [*N.J.S.A.* 2A:23B–8b(1).].

The Act permits a less formal process than a court proceeding. As provided by *N.J.S.A.* 2A:23B–15a:

An arbitrator may conduct an arbitration in such manner as the arbitrator considers appropriate for a fair and expeditious disposition of the proceeding. The authority conferred upon the arbitrator includes the power to hold conferences with the parties to the arbitration proceeding before the hearing and, among other matters, determine the admissibility, relevance, materiality, and weight of any evidence.

Once arbitration commences, the arbitrator may subpoena witnesses or records; permit depositions; permit appropriate discovery to consider, among other things, the "desirability of making the proceeding fair, expeditious, and cost effective"; order compliance with discovery orders or subpoenas the arbitrator issues "and take action against a noncomplying party to the extent a court could if the controversy were the subject of a civil action in this State"; and issue protective orders. *N.J.S.A.* 2A:23B–17a to e.

We underscore this point: when binding arbitration is contracted for by litigants, the judiciary's role to determine the substantive matters subject to arbitration ends. "Arbitration should spell litigation's conclusion, rather than its beginning." *N.J. Tpk. Auth. v. Local 196, I.F.P.T.E.*, 190 *N.J.* 283, 292, 920 *A.*2d 88 (2007). " '[I]t is, after all, meant to be a substitute for and not a springboard for litigation.' " *Fawzy, supra,* 199 *N.J.* at 468, 973 *A.*2d 347 (quoting *Barcon Assocs., Inc. v. Tri–County Asphalt Corp.,* 86 *N.J.* 179, 187, 430 *A.*2d 214 (1981)). From the judiciary's perspective, once parties contract for binding arbitration, all that remains is the possible need to: enforce orders or subpoena issued by the arbitrator, which have been ignored, *N.J.S.A.* 2A:23B–17(g); confirm the arbitration award, *N.J.S.A.* 2A:23B–22; correct or modify an award, *N.J.S.A.* 2A:23B–24, and in very limited circumstances, vacate an award *N.J.S.A.* 2A:23B–23. If not for this limitation on judicial intervention of arbitration awards, "the purpose of the arbitration contract, which is to provide an effective, expedient, and fair resolution of disputes, would be severely undermined." *Fawzy, supra,* 199 *N.J.* at 470, 973 *A.*2d 347 (citing *Barcon, supra,* 86 *N.J.* at 187, 430 *A.*2d 214).

■■■ It also is well settled that "there is a strong preference for judicial confirmation of arbitration awards." *Linden Bd. of Educ. v. Linden Educ. Ass'n*, 202 *N.J.* 268, 276, 997 *A.2d* 185 (2010). *See also Martindale v. Sandvik, Inc.*, 173 *N.J.* 275, 800 *A.2d* 872 (1993). Consistent with the defined "salutary purposes ... courts grant arbitration awards considerable deference." *Borough of E. Rutherford v. E. Rutherford PBA Local 275*, 213 *N.J.* 190, 201, 61 *A.3d* 941 (2013).

■■■ In this matter, plaintiff's requested relief is limited to vacating the arbitration award. "A party seeking to vacate an arbitration award must first obtain trial court review of the award." *Manger v. Manger*, 417 *N.J.Super.* 370, 376, 9 *A.3d* 1081 (App.Div.2010) (citing *Hogoboom v. Hogoboom*, 393 *N.J.Super.* 509, 515, 924 *A.2d* 602 (App.Div.2007)). The court's review is informed by the authority bestowed on the arbitrator by the Act. The Act states a court may vacate an arbitration award *only* upon proof:

(1) the award was procured by corruption, fraud, or other undue means;

(2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to section 15 of this act, so as to substantially prejudice the rights of a party to the arbitration proceeding;

(4) an arbitrator exceeded the arbitrator's powers . . . .

[*N.J.S.A.* 2A:23B–23.] [2]

■■■ Further, "parties may agree to a broader review than provided for by the default provisions in the ... Act." *Fawzy, supra*, 199 *N.J.* at 482 n. 5, 973 *A.2d* 347. Their agreement must "accurately reflect the circumstances under which a party may challenge the award and the level of review agreed upon." *Ibid.*

---

[2] The Court has also instructed an arbitration award may be vacated where it violates "a clear mandate of public policy[.]" *Weiss v. Carpenter*, 143 *N.J.* 420, 443, 672 *A.2d* 1132 (1996). However, such intervention is appropriate only where "the public-policy question is not reasonably debatable[.]" *Ibid.*

For those who think the parties are entitled to a greater share of justice, and that such justice exists only in the care of the court, ... the parties are free to expand the scope of judicial review by providing for such expansion in their contract; that they may, for example, specifically provide that ... awards may be reversed either for mere errors of New Jersey law, substantial errors, or gross errors of New Jersey law and define therein what they mean by that.

[*Tretina v. Fitzpatrick & Assocs.*, 135 *N.J.* 349, 358, 640 *A.*2d 788 (1994) (internal quotation marks and citations omitted).]

Finally, a party seeking to vacate an arbitration award bears the burden of demonstrating "fraud, corruption, or similar wrongdoing on the part of the arbitrator[ ]." *Id.* at 357, 640 *A.*2d 788. (internal quotation marks and citations omitted); *see also Del Piano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 372 *N.J.Super.* 503, 510, 859 *A.*2d 742 (App.Div.2004) ("[B]ecause of the strong judicial presumption in favor of the validity of an arbitral award, the party seeking to vacate it bears a heavy burden."), *certif. granted*, 183 *N.J.* 218, 871 *A.*2d 95 (2005), *appeal dismissed*, 195 *N.J.* 512, 950 *A.*2d 901 (2005).

Having outlined these statutory parameters, we note, "the scope of review of an arbitration award is narrow. Otherwise, the purpose of the arbitration contract, which is to provide an effective, expedient, and fair resolution of disputes, would be severely undermined." *Fawzy, supra*, 199 *N.J.* at 470, 973 *A.*2d 347 (citing *Barcon Assocs., supra*, 86 *N.J.* at 187, 430 *A.*2d 214). "As the decision to vacate an arbitration award is a decision of law, this court reviews the denial of a motion to vacate an arbitration award de novo." *Manger, supra*, 417 *N.J.Super.* at 376, 9 *A.*3d 1081 (citation omitted). *See also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) (holding no "special deference" is accorded the trial judge's "interpretation of the law and the legal consequences that flow from established facts").

### III.

### A.

Plaintiff advances several arguments for vacating the March 17, 2011 arbitration award. She contends the 2009 agreements were

not the product of arbitration and, therefore, should be set aside. Further, she maintains the arbitrator exceeded his powers by acting as both mediator and arbitrator, presided over issues not subject to arbitration, and exercised undue means in repeatedly denying plaintiff access to "relevant financial documents."

Defendant counters, stating plaintiff's request to vacate was filed beyond the 120–day window set forth in *N.J.S.A.* 2A:23B–23b. We need not address defendant's procedural challenge, in light of the fact that the March 17, 2011 arbitration award was not a final, conclusive determination of all issues concluding the arbitration.

This case unraveled because the parties agreed to arbitration, then chose to do something else. That said, we analyze what actually occurred resulting in the 2009 agreements and whether our intervention is warranted. Even though the process employed was not an arbitration hearing as envisioned by the Act or as agreed by the parties, we conclude the procedures were not fundamentally unfair, the process was not infirm, and the 2009 agreements need not be vacated.

Regarding the first agreement to distribute the medical practice, the arbitrator did not participate in the settlement discussions; Rubin had the lead role. The parties funneled information to him, he made recommendations, the parties' attorneys and experts asked questions, and a decision to accept, modify or reject the recommendations was individually made. Plaintiff never states she and her original attorney did not discuss these issues, or claims she was deprived of the ability to consider documentation prior to reaching the February 2009 agreement. Rather, her complaint is the documents were not kept by her original attorney and, therefore, were not available to substituted counsel.[3] Plaintiff also complains that when she sought subsequent review of the financial information regarding the business interests she was

---

[3] The record is not entirely clear, but it appears Rubin reviewed submissions from each side, which he returned after issuing his recommendation.

denied access. We find the process employed did not violate the Act and plaintiff's challenges are insufficient to vacate the agreement dividing the medical practices.

Although parties contract to arbitrate, settlement negotiations are not foreclosed by the Act. *See, e.g., N.J.S.A.* 2A:23B–15a (authorizing an arbitrator to hold conferences with the parties to the arbitration proceeding before the hearing). Indeed, New Jersey courts have found that the " '[s]ettlement of litigation ranks high in [the] public policy' " of this State. *Puder v. Buechel,* 183 *N.J.* 428, 437, 874 *A.*2d 534 (2005) (quoting *Nolan ex rel. Nolan v. Lee Ho,* 120 *N.J.* 465, 472, 577 *A.*2d 143 (1990) (internal quotation marks and citation omitted) (alterations in original)). We have held, "so long as the parties acknowledge that the agreement was reached voluntarily and is for them, at least, fair and equitable" it should be enforced. *Lerner v. Laufer,* 359 *N.J.Super.* 201, 217, 819 *A.*2d 471 (App.Div.2003). "Advancing that public policy is imperative ... where matrimonial proceedings have increasingly overwhelmed the docket." *Puder, supra,* 183 *N.J.* at 430, 874 *A.*2d 534; *see also Davidson v. Davidson,* 194 *N.J.Super.* 547, 550, 477 *A.*2d 423 (Ch.1984) ("With more divorces being granted now than in history, and with filings on the rise, fair, reasonable, equitable and, to the extent possible, conclusive settlements must be reached, or the inexorable and inordinate passage of time from initiation of suit to final trial will be absolutely devastating[.]").

Plaintiff's suggestion she was uninformed is rejected as this record contains no evidence to show her decision dividing the medical practice was not made with full knowledge or was the result of coercion. Plaintiff is a highly educated, successful, professional businesswoman. The parties were married for fourteen years, and, even if some of defendant's enterprises were founded late in the marital relationship, their existence was disclosed and plaintiff was able to gain necessary information regarding these entities. The circumstances here reflect no disparity in bargaining power between plaintiff and defendant.

Moreover, plaintiff's agreement, guided by the advice of her independently chosen legal counsel and aided by her individual accountant, was made after reflection on alternatives. In fact, the record shows that immediately following plaintiff's initial acceptance of Rubin's recommendation, her accountant and attorney repudiated assent, asserting errors were found in Rubin's calculations. Following further review, plaintiff withdrew her objection and reaffirmed her agreement to be bound, accepting through counsel, the distribution as fair and equitable. The record supports plaintiff's decision was reasoned, voluntary and deliberate, making it a binding contract between the parties.

These same reasons uphold the memorandum of understanding reached on July 8, 2009, along with its amendments dated September 22, 2009, and October 15, 2009. These detailed documents, fully executed by the parties and counsel, were not the product of arbitration, but mediation. Following our review, we find no basis to set them aside.

Certainly, mediation, although a form of alternate dispute resolution, differs from binding arbitration, which raises the next question posed by plaintiff: can parties who agree to proceed in binding arbitration change the process to mediation? We conclude they can. Even though the parties contracted to pursue "binding arbitration," their change of course to utilize mediation will not invalidate their settlement agreements.

Mediation is governed by the Uniform Mediation Act (UMA), *N.J.S.A.* 2A:23C–1 to –13, *R.* 1:40–4, and *R.* 1:40–5(b). Similar to arbitration, mediation provides an alternate, more informal forum than litigation, allowing confidential and candid exchange of information between the parties and the mediator to aid the parties' efforts in reaching an accord on disputes. Mediated agreements, like other contracts, must be knowingly and voluntarily reached. A settlement agreement, reached in mediation, which is incorporated into an executed, signed written agreement

is enforceable. *Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C.,* 215 *N.J.* 242, 250–51, 263, 71 *A.*3d 888 (2013).

The July 8, 2009 memorandum of understanding executed by the parties is direct and expressly states:

> This Memorandum between [the parties] shall describe the outline of an Agreement that was reached between the parties on July 8, 2009 after mediation with the assistance of [the arbitrator] and [Rubin].
>
> . . . .
>
> This Memorandum is the result of many months of negotiations and many conferences with [the arbitrator] and Mr. Rubin. The parties are entering into this Memorandum freely and voluntarily after conferring with their attorneys and anyone else with whom they wish to confer. The parties agree that this Memorandum represents a fair compromise of the issues. They acknowledge that by entering into this Memorandum they are waiving their rights to participate in [the] Arbitration hearing and waive the right to have the issues set forth in this Memorandum decided by the Arbitrator.

The amendment further provides "the parties agree to the foregoing freely and voluntarily."

Despite her protests, plaintiff offers no evidence to repudiate these pronouncements. Nothing supports the failure of the parties to exchange necessary information. *See R.* 1:40–5(b)(3) ("In mediation of economic aspects of family actions, parties are required to provide accurate and complete information to the mediator and to each other, including but not limited to tax returns, Case Information Statements, and appraisal reports."). Also, the mediation agreement satisfies the prerequisites for enforcement as the terms were incorporated into a written document signed and distributed to all parties. *Willingboro Mall, supra,* 215 *N.J.* at 263, 71 *A.*3d 888. Our review of this record unearths no basis to undo the consensual 2009 agreements.

▮ We also reject plaintiff's claims of legal insufficiency. Although we agree, for example, the child support agreement omitted a baseline determination, that fact may cause future proof problems if modification is sought, but it alone would not void the agreement.

Plaintiff points to Hoberman's analysis of her projected 2008 income to suggest the alimony and child support provisions in the 2009 agreements must be vacated. We conclude if plaintiff's projected income were inaccurate, standing alone that fact is insufficient to vacate the July 8, 2009 agreement.

First, the support award was not simply a guidelines calculation. Necessary information required by *N.J.S.A.* 2A:34-23a, includes not only plaintiff's income, but also defendant's income, the children's needs, and other funds available, including any income or assets of the children.

Second, the support calculation did not stand alone as the agreement as a whole integrated settlement of both support and various equitable distribution issues. Often these matters are "interrelated" amidst compromise of parties' myriad economic concerns. *Lehr v. Afflitto,* 382 *N.J.Super.* 376, 396, 889 *A.*2d 462 (App.Div.2006). *See also Lynn v. Lynn,* 165 *N.J.Super.* 328, 342, 398 *A.*2d 141 (App.Div.) (noting the necessary interrelationship between property distribution, alimony and child support), *certif. denied,* 81 *N.J.* 52, 404 *A.*2d 1152 (1979). "[T]he termination of a marriage involves an 'economic mosaic' comprised of equitable distribution, alimony and child support and ... these financial components interface." *Koelble v. Koelble,* 261 *N.J.Super.* 190, 192, 618 *A.*2d 377 (App.Div.1992).

Third, plaintiff's argument does not explain how Hoberman's conclusions affect the final overall result. Hoberman refuted Rubin's inclusion of certain items in the 2008 income projections, but he did not specify plaintiff's actual reported 2008 income or compare it to Rubin's projected computations.

Fourth, even if Rubin's calculations of plaintiff's income were wrong, it is well established that significant changes in circumstances warrant review and potential modification of a child support award. *Lepis v. Lepis,* 83 *N.J.* 139, 145, 416 *A.*2d 45 (1980). Therefore, were plaintiff to prove such a change along with the children's needs, the support amount could be altered.

As a result of our review, we decline to vacate the 2009 agreements, finding unfounded plaintiff's claims that the procedures followed to reach them were defective or her acceptance unreliable. As noted, the parties agreed to mediate and conduct settlement discussions, rather than commence an arbitration hearing. That procedure is permissible and the agreements are enforceable.

### B.

We turn to plaintiff's next challenge asserting the arbitrator's change of role to a facilitator of a mediated agreement obviated his ability to thereafter proceed as an arbitrator. Plaintiff argues the arbitrator "committed misconduct and exceeded his powers by acting as both a mediator and an arbitrator." She further explains the arbitrator aided mediation of the disputes, then, when she sought underlying documentation, he "enforced the [agreements] that he had written [as a mediator] as if they were the result of an actual arbitration," converting the result to a binding arbitration award. This is an issue of first impression.

Our review considers the compatibility of the same party assuming the role of mediator and arbitrator. Mediation and arbitration both allow for resolution of disputes outside the court process, and the hallmark of a mediator and an arbitrator is neutrality. *See R.* 1:40–2(1)(a)(1) (defining arbitration as "[a] process by which each party and/or its counsel presents its case to a neutral third party, who then renders a specific award"). Nevertheless, we conclude the differences in the roles of these two types of dispute resolution professionals necessitate that a mediator, who may become privy to party confidences in guiding disputants to a mediated resolution, cannot thereafter retain the appearance of a neutral factfinder necessary to conduct a binding arbitration proceeding. Consequently, absent the parties' agreement, an arbitrator appointed under the Act may not assume the role of mediator and, thereafter, resume the role of arbitrator.

Mediation is included as a "Facilitative Process[,]" which is defined as "a process by which a mediator facilitates communication between parties in an effort to promote settlement without imposition of the mediator's own judgment regarding the issues in dispute." *R.* 1:40–2(c). "A mediator, although neutral, often takes an active role in promoting candid dialogue by identifying issues [and] encouraging parties to accommodate each other['s] interests." *Lehr, supra,* 382 *N.J.Super.* at 394, 889 *A.*2d 462 (internal quotation marks and citations omitted) (alteration in original); *see also* James R. Coben & Peter N. Thompson, "Disputing Irony: A Systematic Look at Litigation About Mediation," 11 *Harv. Negot. L. Rev.* 43 (" 'As a facilitator, a mediator is not tasked with reaching a final decision in a matter, but rather instills trust and confidence of the participants in the mediation process, allowing them to resolve their differences.' " (quoting *V.J.L. v. Red,* 39 *P.*3d 1110, 1113 n. 3 (Wyo.2002))).

Mediations are not conducted under oath, do not follow traditional rules of evidence, and are not limited to developing the facts. Admittedly, mediation encourages confidential disclosures to the mediator, whose training is designed to utilize these confidential positions to aid the parties to evaluate their positions, promote understanding of the other side's position, and reach a consensus. These confidences are "insured only if the participants trust that information conveyed to the mediator will remain in confidence." *Lehr, supra,* 382 *N.J.Super.* at 395, 889 *A.*2d 462. "Mediation communications, which 'would not exist but for the settlement attempt,' are made by parties 'without the expectation that they will later be bound by them.' " *State v. Williams,* 184 *N.J.* 432, 447, 877 *A.*2d 1258 (2005) (quoting Michael L. Prigoff, *Toward Candor or Chaos: The Case of Confidentiality in Mediation,* 12 *Seton Hall Legis. J.* 2, 13 (1988)). "Successful mediation, with its emphasis on conciliation, depends on confidentiality perhaps more than any other form of [alternate dispute resolution]." *Williams, supra,* 184 *N.J.* at 447, 877 *A.*2d 1258 (citation omitted). "Indeed, mediation stands in stark contrast to formal adjudication,

and [ ] arbitration, in which the avowed goal is to uncover and present evidence of claims and defenses in an adversarial setting." *Ibid.*

On the other hand, an arbitrator's role is evaluative, requiring the parties to present their evidence for a final determination. *See R.* 1:40–2(b)(2) (defining "Evaluative Process" to include "Neutral Fact Finding: A process by which a neutral, agreed upon by the parties, investigates and analyzes a dispute involving complex or technical issues, and who then makes nonbinding findings and recommendations."). Arbitrators essentially weigh evidence, assess credibility, and apply the law when determining whether a party has proven his or her request for relief. *See* Lela P. Love, *Symposium: The Top Ten Reasons Why Mediators Should Not Evaluate*, 24 *Fla. St. U.L.Rev.* 937, 938 (1997). An arbitrator makes a final decision, which binds the parties. *See N.J.S.A.* 2A:23B–1 (defining an "arbitrator" as "an individual appointed ... to render an award ... in a controversy that is subject to an agreement to arbitrate"). Thus, "arbitrators should conduct the proceedings in an evenhanded manner and treat all parties with equality and fairness at all stages of the proceedings." *Barcon, supra,* 86 *N.J.* at 190, 430 *A.2d* 214 (internal quotation marks and citations omitted).

Toward this end, the Act vests arbitrators with broad discretion over discovery and other procedural matters to "conduct an arbitration in such manner as the arbitrator considers appropriate for a fair and expeditious disposition of the proceeding. The authority conferred upon the arbitrator includes the power to hold conferences with the parties ... before the hearing[.]" *N.J.S.A.* 2A:23B–15a. The statute's broad conferral of authority "does not require any particular procedures, mandate discovery, compel the maintenance of a record, command a statement by the arbitrator regarding his findings and conclusions, or an expression of the reasons why he reached the result that he did[,]" unless expressly required under the parties' arbitration

agreement. *Johnson v. Johnson,* 204 *N.J.* 529, 546, 9 *A.*3d 1003 (2010) (citing *N.J.S.A.* 2A:23B–1 to –32).

While we recognize the Act envisions a need for flexibility to meet a wide variety of situations presented in arbitration proceedings, we are not persuaded the Act intended an appointed arbitrator may first assume the role of mediator then switch back to conduct final arbitration hearings. As noted, an effective mediator gains each party's confidence and offers advice to steer them toward settlement. Those confidential communications gained in mediation are precluded from being considered in a court contest, *Isaacson v. Isaacson,* 348 *N.J.Super.* 560, 577, 792 *A.*2d 525 (App.Div.), *certif. denied,* 174 *N.J.* 364, 807 *A.*2d 195 (2002), and would similarly be precluded from consideration in an arbitration hearing. *See also Willingboro Mall, supra,* 215 *N.J.* at 245 ("Communications made during the course of a mediation are generally privileged and therefore inadmissible in another proceeding.").

In researching this issue, we found limited discussion of the subject. Initially, we are aware *Rule* 1:40–2(d) identifies as a "Hybrid Process" of complementary dispute resolution "[m]ediation-arbitration," which it defined as "[a] process by which, after an initial mediation, unresolved issues are then arbitrated." The rule does not address whether the same party may perform both functions or whether issues attempted to be mediated may then be arbitrated.

In *Isaacson,* we discussed the efficacy of assuming the dual role of custody mediator and guardians ad litem (GAL), examining the applicable court rules governing appointments of custody and parenting time mediators, *R.* 1:40–5(a) and GALs, *R.* 5:8B. We noted *Rule* 1:40–5(c) specifies a custody and parenting time mediator may not subsequently act as an evaluator in the proceeding or make any recommendation to the court respecting the issues. *Isaacson, supra,* 348 *N.J.Super.* at 577, 792 *A.*2d 525. We concluded "[a] practical reading of the rules and common sense preclude[d] the [possible] dual role of mediator and GAL." *Id.* at

575, 792 *A.2d* 525. We find *Isaacson's* distinction between an evaluative versus facilitative role helpful.

Canon IV.H of the Code of Ethics for Arbitrators in Commercial Disputes, approved by the American Bar Association and the American Arbitration Association, states "an arbitrator should not be present or otherwise participate in the settlement discussions unless requested to do so by all parties. An arbitrator should not exert pressure on any party to settle." This guideline is also directed to the evaluator-facilitator dichotomy. Despite the code's applicability to commercial matters, such a concern certainly exists and may even be heightened in the arbitration of an emotionally charged matrimonial matter.

We uncovered one regulatory provision presumably suggesting an appointed arbitrator may mediate or assist the parties to reach a settlement during compulsory interest arbitration to resolve collective bargaining disputes between police and fire departments and their employees. *N.J.A.C.* 19:16–5.7(c). However, upon examination of the statutory authority governing the regulation, we find a marked distinction between the two proceedings, as the statute requires: "Any mediation or factfinding invoked pursuant to . . . this section shall terminate immediately upon the filing of a petition for arbitration." *N.J.S.A.* 34:13A–16(b)(2). Again, the distinction between the roles of the facilitator in a mediation and the factfinder in an arbitration is important.

Based on our review of the distinctly different proceedings of arbitration and mediation, we conclude the positions of arbitrator and mediator are in conflict. An arbitrator must "maintain 'broad public confidence in the integrity and fairness of the [arbitration] process.'" *Barcon, supra,* 86 *N.J.* at 190, 430 *A.2d* 214 (quoting Holtzmann, *The First Code of Ethics for Arbitrators in Commercial Disputes,* 33 *The Business Lawyer* 309, 312 (1977)). If the same person acts as a mediator, obtains party confidences or offers opinions on the issues in dispute, a conflict arises were he or she to then switch roles to act as an arbitrator, making the final call. We find the need for an arbitrator's

complete objectivity bears heavily on the integrity of the arbitration process. This concern becomes even more problematic when arbitrating matrimonial disputes between already suspicious adverse parties.

In the family law context, we could envision parties agreeing in writing to allow one person to perform these roles regarding separate issues; for example, mediation of custody matters and arbitration of financial issues. However, this should be the parties' choice. Absent a specific agreement clearly defining and accepting the complementary dispute resolution professional's roles, dual roles are to be avoided.

It is advisable for parties to exhaust all applicable dispute resolution alternatives, including settlement conferences and mediation before undertaking arbitration. Once these available courses are exhausted and arbitration is chosen, the arbitrator should promptly commence hearings and resolve matters expeditiously.

In this matter, the arbitrator disavowed any mediation role, suggesting he merely performed conferencing. The record supports the arbitrator's position regarding the agreement dividing the parties' medical practices. Unfortunately, however, we cannot reach that same conclusion in light of the unequivocal introductory paragraph contained in the July 8, 2009 memorandum of understanding, which is described as "an Agreement that was reached between the parties ... after mediation with the assistance of [the arbitrator and Rubin]." The agreement's terms place the arbitrator in the role of moving the parties toward compromise in mediation. We will not infer that the written document is inartful or accept the suggestion the arbitrator merely brought to bear his informed judgment in order to reach a fair solution. Rather, we can only conclude the agreement means what it says: it is a product of mediation reached with the assistance of both the arbitrator and Rubin.

Based on our determination, absent the parties' contract to the contrary, once a neutral assumes the role of mediator, he or she

may not assume the role of arbitrator. Therefore, any "arbitration awards" based on the arbitrator's finding, entered following the 2009 mediated agreements must be set aside. After guiding mediation, the arbitrator could no longer proceed, and by doing so here, he exceeded his powers. *N.J.S.A.* 2A:23B–23a(4).

Applying this holding to the entered arbitration awards, we reach the following conclusions. The November 30, 2011 Family Division order confirming the August 11, 2011 arbitration order adjudicating the award of counsel fees and costs is vacated. Next, examining the March 17, 2011 arbitration award, paragraph (1) adopts Rubin's allocation of credits and disposition of marital assets, which the parties agreed to accept. Although reached during arbitration after the 2009 mediations, the provisions adopt a settlement agreement and were not the product of the arbitrator's determination. Paragraphs (2) through (5) entered the parties' 2009 agreements as final. For the reasons set forth earlier in our opinion upholding the parties' 2009 agreements, these provisions need not be disturbed. Paragraph (7), like paragraph (1), included a post-mediation agreement for a credit due plaintiff, not an arbitration award and may stand. Paragraphs (6), (8), (10) through (13) are procedural provisions, which also need not be set aside. Only paragraph (9) of the March 17, 2001 arbitration award, addressing the underlying calculation of child support, represents a post-mediation award made by the arbitrator, which must be vacated.

The Family Division's August 19, 2011 order, which confirmed the March 17, 2011 arbitration award is vacated, to the extent the order confirmed paragraph (9) of the arbitration award. However, we need not set aside confirmation provisions incorporating the parties' 2009 agreements into the JOD.

Also, we vacate the provisions in the July 16, and September 23, 2010 Family Part's orders confirming the arbitrator's awards that conflict with the provisions of this opinion. Specifically, the provisions adopting the arbitrator's denial of plaintiff's document requests and confirm the May 25, 2010 arbitration decision, excepting, however, those provisions regarding the 2009 agreements.

The matter is remanded to the Family Part for the sole purpose of supervising the parties' selection of a new arbitrator, to conduct arbitration proceedings under the Act to determine unresolved financial issues, that are not otherwise covered by their mediated and other settlement agreements.

The final issue for discussion centers on plaintiff's request for financial disclosure following the execution of the 2009 agreements. We are at a loss to understand why this request was met with such resistance, in light of the express terms of the arbitration agreement and the parties' protective order.

The record contains no agreement to limit copying or review of the other side's financial disclosures rendered to Rubin. Rather, the documents governing arbitration gave plaintiff the absolute right to copy all relevant information. Specifically, the appended statement of rights of arbitrating parties included "the right to be provided copies of all documents presented to the [a]rbitrator by their spouse." Further, the protective order allowed the documents to be reviewed by the parties along with their counsel and experts. Allowing review of the documents would not have caused incessant delay, but rather would have allowed substituted counsel the opportunity to become informed.

A concern often arises that post-settlement remorse may motivate a party to retract a valid agreement. However, such tactics can effectively be thwarted through sanctions or an award of attorney's fees for frivolous conduct. *See N.J.S.A.* 2A:23B–21 (affording arbitrator's authority to award exemplary relief and reasonable attorney's fees). Further, the request could have been temporally conditioned, and payment for Rubin's time could have been allocated solely to plaintiff.

Defendant relies on our decision in *Manger,* to suggest an arbitrator's discovery decisions must be upheld. Certain discovery limitations must be made in "the interest of making the hearing 'fair, expeditious, and cost effective[.]' " *Manger, supra,* 417 *N.J.Super.* at 376, 9 *A.*3d 1081 (quoting *N.J.S.A.* 2A:23B–17c). In *Manger,* we reviewed defendant's claim of misconduct alleging

the arbitrator improperly denied submission of expert evaluations of the parties' business. *Id.* at 374, 9 *A.*3d 1081. We found no basis to disturb the arbitrator's award, upholding "the arbitrator's broad authority to conduct the proceeding[.]" *Id.* at 377, 9 *A.*3d 1081. However, the facts in *Manger* are distinguishable. The arbitrator in that case had determined to follow pre-arbitration orders that were entered by the Family Part, which included a deadline for submission of expert evaluations. *Id.* at 373, 9 *A.*3d 1081.

> Consistent with her authority to "conduct an arbitration in such manner as the arbitrator considers appropriate for a fair and expeditious disposition of the proceeding," *N.J.S.A.* 2A:23B–15(a), the arbitrator could have ignored or revised the orders entered in the trial court. On the other hand, the arbitrator could apply any and all orders previously entered in the trial court and fashion new discovery and case management orders for the arbitration proceeding. Here, the arbitrator exercised her broad authority to follow the latter course.
>
> [*Id.* at 376, 9 *A.*3d 1081.]

More important, "the arbitrator provided an opportunity for each party to identify and exchange the documents on which they intended to rely at the hearing." *Id.* at 377, 9 *A.*3d 1081.

Here, although there was some review of documentation, Rubin and the parties' counsel apparently had not retained the considered information. When plaintiff's substituted counsel sought to gain background for the underlying agreements, the arbitrator denied the request and restrained Rubin from further discussion of those issues with substituted counsel. As a result of these determinations, substituted counsel faced an untenable and even suspicious situation, precluding her from providing informed advice to her client and prompting repeated motions to reopen discovery.

 A court may vacate an arbitration award when it is procured by undue means or resulted from an arbitrator exceeding his designated powers. *N.J.S.A.* 2A:24–8a. The judicial inquiry must consider more than whether a mere mistake occurred. *Tretina, supra,* 135 *N.J.* at 356–57, 640 *A.*2d 788 (quotation marks and citation omitted). Rather, that

> formulation requires that the arbitrator[ ] must have clearly intended to decide according to law, must have clearly mistaken the legal rule, and that mistake must

appear on the face of the award. In addition, the error, to be fatal, must result in a failure of intent or be so gross as to suggest fraud or misconduct.

[*Id.* at 357, 640 *A.*2d 788 (internal quotation marks and citations omitted).]

Although we agree the arbitrator properly determined discovery would not be reopened, we cannot similarly uphold the order precluding plaintiff from obtaining documents to which she was unquestionably entitled. The contract to arbitrate specifically granted plaintiff this right and nothing reflects she waived that right. Barring substituted counsel from this information represents an egregious remaking of the arbitration contract, which cannot stand. The Family Part's order confirming this determination must also be vacated. Once appointed, the new arbitrator shall consider plaintiff's document requests, in light of our opinion.

To the extent plaintiff has presented arguments not specifically addressed in our opinion, we reject them as lacking sufficient merit to warrant discussion. *R.* 2:3–11(e)(1)(E).

We close with these observations. Arbitration, particularly binding arbitration, must be purposefully chosen, and the parameters must be designated in a contract between the parties. If binding arbitration is selected as the forum for resolution of disputes, a litigant cannot jump back and forth between the court and the arbitral forum. By its very nature, arbitration does not permit such a hybrid system. Further, arbitration "should be a fast and inexpensive way to achieve final resolution of . . . disputes and not merely a way-station on route to the courthouse," *Borough of E. Rutherford, supra,* 213 *N.J.* at 201, 61 *A.*3d 941 (internal quotation marks and citations omitted). Attempts to return to the court, except to confirm the final arbitration award, are at odds with this objective.

In the matter at bar, the parties' contract concisely defined matters to be addressed in arbitration, yet from commencement, the Family Part maintained involvement such as scheduling case management and entertaining a motion for a protective order, both of which fall directly within the adjudicatory responsibilities of the arbitrator. *N.J.S.A.* 2A:23B–17e. More-

over, the parties held a mistaken belief that court intervention was permitted to check the decisions of the arbitrator. This is untenable. The Act's provisions are unmistakable: once binding arbitration is chosen and the arbitrator(s) named, the court is no longer involved in reviewing or determining the substantive issues. The court's role is circumscribed to confirm a final arbitration award, correct obvious errors, and consider whether the award should be vacated, *only* when one of the limited bases set forth in *N.J.S.A.* 2A:23B–23 has occurred. The piecemeal approach demonstrated here prolonged the final result and eliminated the main benefit of arbitration, "to provide an effective, expedient, and fair resolution of disputes[.]" *Fawzy, supra,* 199 *N.J.* at 470, 973 *A.*2d 347 (citations omitted).

Finally, had the parties actually followed the path of binding arbitration, the need for a PSA would be obviated because an issued arbitration award would be confirmed by court order assuring compliance. No separate agreement memorializing the order is needed. Insistence upon preparation of a PSA appears to result from habit, not necessity.

 Lastly, we do not mean to suggest parties who seek to arbitrate disputes should abandon all hope of amicable resolution. We urge parties to exhaust possible settlement alternatives prior to contracting for arbitration. If arbitration is accepted, parameters for settlement discussions should be set by the arbitrator.

## IV.

In summary, the parties' agreements dated February, (incorporated by a Family Part order dated April 1), July 8, September 22, and October 15, 2009 are valid and enforceable. The custody and parenting time consent order reached on February 4, 2010 also is not challenged and remains unchanged. Consequently, the March 8, 2010 JOD as originally filed need not be disturbed because it adopts the 2009 agreements reached and finalized the custody agreement. The JOD further accepts the parties' agreed allocation of debits and credits. The arbitration record suggests this issue was also settled, not resolved by orders following an arbitra-

tion hearing. That resolution, occurring after the arbitrator's disqualification, stands on its own as a voluntary agreement.

We vacate the trial court's November 30, 2011 confirmation of the August 11, 2011 arbitration award, allocating attorney's fees and costs as it was rendered following what we have identified arbitrators' unauthorized action. These issues along with any unresolved financial matters, and consideration of release of financial documents shall be addressed by the new arbitrator, once chosen by the parties.

Affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.