**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0789-20

MHA, LLC, d/b/a
MEADOWLANDS HOSPITAL,

    Plaintiff-Respondent,

v.

BESLER & COMPANY, INC.,

    Defendant-Appellant.

_____

           Submitted February 14, 2022 – Decided July 13, 2022

           Before Judges Sumners and Firko.

           On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1867-17.

           Gordon Rees Scully Mansukhani, LLP, attorneys for appellant (Mark A. Trokan, of counsel and on the briefs; Stephanie Imbornone, on the briefs).

           Mazie Slater Katz & Freeman, LLC, attorneys for respondent (Eric D. Katz, of counsel and on the brief; David M. Estes, on the brief).

PER CURIAM

Defendant Besler & Company, Inc. appeals from the Law Division order confirming the arbitration award in favor of plaintiff MHA, LLC d/b/a Meadowlands Hospital Medical Center (Meadowlands) entering judgment of $1,795,260, plus pre- and post-judgment interest, and denying defendant's request to vacate the arbitration award. The arbitrator determined that defendant breached its contractual duties in providing consultation services to plaintiff regarding whether it was financially advisable to implement a stand-alone residency program at the Meadowlands Hospital. Having considered the record and applicable law, we affirm.

I.

A.

On January 8, 2010, plaintiff, a New Jersey healthcare service provider, entered into an agreement with Liberty Riverside Healthcare Inc. and Liberty Healthcare System, Inc. (collectively "Liberty") to purchase all of Liberty's assets, including Meadowlands.

Two years later in February 2012, plaintiff contracted with defendant to prepare plaintiff's Medicare cost report (MCR)[1] and state hospital cost report for

---

[1] Each fiscal year, Meadowlands is required to submit a MCR to its Medicare administrative contractor (MAC) regarding the patient care services rendered.

the 2011 fiscal year. Defendant assisted medical centers in recovering Medicare reimbursements for patient services, preparing and filing annual MCRs, and obtaining GME reimbursement[2] and indirect medical education (IME) reimbursement analysis for medical centers seeking to establish residency programs.

In June 2012, plaintiff decided to create a GME program at Meadowlands. Plaintiff contracted with defendant to provide a three-year estimate of Meadowland's GME and IME reimbursements for its proposed resident sharing program with Palisades Medical Center (Palisades). In pertinent part, the written agreement provided: "Please be advised this review includes review of Medicare regulations, which are subject to interpretation. [Defendant's] findings will be based upon [defendant's] understanding of these regulations."

---

The graduate medical education (GME) reimbursement is a component of this report.

[2] The Medicare GME payment reimburses teaching hospitals for the cost of resident and teacher salaries and fringe benefits and overhead costs related to the teaching programs.

A-0789-20

Within two weeks, defendant—using a per resident amount (PRA)[3] calculated by Novitas for its reimbursement analysis—provided plaintiff an estimated reimbursement analysis, projecting an overall net loss. For this PRA calculation Novitas relied,[4] in part, on defendant's incorrect assertion that the joint residency program with Palisades would be the first time "residents in an approved GME program trained" at Meadowlands.[5] About a week later, Meadowlands began its resident sharing program with Palisades.

In early 2013, plaintiff developed a plan to establish a stand-alone GME program beginning on July 1, 2013. Plaintiff requested defendant estimate the GME and IME reimbursement analysis for the stand-alone program. Plaintiff informed defendant it would only implement the stand-alone program if it would financially "break even" within five years. In June 2013, defendant agreed to

---

[3] The PRA is the "allowable amount paid to [plaintiff] as reimbursement for the GME program" and is used to prepare the MCR. The PRA is calculated and set by the medical center's MAC, Novitas in this case.

[4] Novitas relied on information supplied in the 2012 cost report submitted by defendant.

[5] Defendant assumed 2012 was the first year Meadowlands had its own residents and used this assumption in their 2012 cost report. In fact, Meadowlands had two podiatry residents in 2002. Because of the 2002 residents, the estimated PRA should have been determined based on the PRA's in place in 2002, updated each year to take into account inflation. This amount was significantly lower than the PRA included in the 2012 analysis and cost report.

the engagement and submitted to plaintiff its analyses, but a written agreement was never executed for its services.

After initially advising plaintiff that the stand-alone program projected to be an overall net loss, defendant provided plaintiff an amended analysis estimating net losses for fiscal years 2013 and 2014, but with net profits in fiscal years 2015 through 2017. Consequently, plaintiff established the stand-alone program beginning in July 2013. In both of its estimates, defendant used the same incorrect PRA as it did in its 2012 analysis.

On May 10, 2016, plaintiff sold Meadowlands to NJMHMC LLC. The parties' agreement stated, in pertinent part:

> Section 8.8 Medicare and Medicaid Adjustments.
>
> (a) Buyer and Seller acknowledge and agree that (i) all reimbursements from Medicare . . . and all charges, settlements or setoffs applied by Medicare . . . in respect of services . . . rendered by Seller to patients of . . . [Meadowlands] prior to the Closing, as reflected on the cost reports submitted by Seller to Medicare . . . shall be for the account of Seller . . . .
>
>     . . . .
>
> (c) Upon the imposition of Charges against either party (the "Charged Party") which Charges are not for the account of the Charged Party pursuant to Section 8.8(a), the Charged Party shall send written notice to the other party (the "Reimbursing Party") requesting reimbursement for the Charges imposed . . . , together

5

with a copy of the correspondence provided by Medicare . . . which accompanied and relates to the impositions of the Charges, and such other documentation sufficient to identify the Services to which such Cha[rg]es relate. The Reimbursing Party shall, within seven . . . days of its receipt of the Request for Reimbursement, reimburse the Charged Party for those Charges set forth in the Request for Reimbursement which are properly for the account of the Reimbursing Party pursuant to Section 8.8(a).

At the end of 2016, Novitas audited the residency program for 2015, and discovered Meadowlands had been overpaid due to the miscalculated PRA. A subsequent audit of the 2014 cost report recalculated Meadowland's PRA[6] and prepared an adjustment report dated March 17, 2017. Patrick Metzger, a consultant for plaintiff, testified that Meadowlands was only entitled to $3,435,125 but received $5,230,385, thereby owing $1,795,260 in reimbursements. Meadowlands entered an extended repayment schedule with Novitas in which $35,428.76 was collected monthly, starting September 1, 2016, by withholding Medicare reimbursements until the balance was paid in full. Because plaintiff had already sold Meadowlands, plaintiff had to reimburse the medical center's new owner, NJMHMC LLC, pursuant to their purchase agreement.

---

[6] Novitas reduced the PRA from $136,459 to $95,857.89.

A-0789-20

B.

Plaintiff sued defendant. In its first amended complaint, plaintiff asserted claims of common law fraud, civil conspiracy, breach of contract, and negligence relating to the parties' June 2012 contract. The first amended complaint included an impact summary containing calculations detailing plaintiff's alleged damages.

Following the conclusion of discovery and after the trial date had been set for March 1, 2019, plaintiff unsuccessfully moved to extend discovery under Rule 4:24-1(c); the motion judge determined there was no showing of exceptional circumstances. Nevertheless, plaintiff served defendant an expert report authored by Metzger twelve days later on March 12. Defendant objected and successfully moved before Judge Kimberly Espinales-Maloney to bar plaintiff's use of the expert report and Metzger's testimony at trial. The judge ruled Metzger's report was inadmissible net opinion and there would be severe prejudice to defendant to extend discovery.

With the parties prepared to start trial with selection of the jury, they agreed to the dismissal of plaintiff's first amended complaint with prejudice and the submission of plaintiff's claims to binding arbitration. The parties submitted a joint stipulation of dismissal to binding arbitration in accordance with the rules

of the American Arbitration Association (AAA) - Commercial Disputes. The stipulation prohibited further discovery, except for allowing plaintiff to conduct three depositions within three months and precluded the use of experts and their reports. The order provided that application could be made to the court for final judgment confirming the arbitration award.

Several months later, Judge Espinales-Maloney issued two court orders. The first compelled the parties to submit to binding arbitration as soon as possible and barred plaintiff from introducing or relying on any evidence that was not produced during discovery and from taking its overdue depositions. The second limited the scope of the arbitration "to the triable issues in the same procedural posture as the case existed at the time of the parties['] appearance . . . for [t]rial." The parties later entered into an arbitration agreement designating an arbitrator and affording him powers under the AAA Commercial Rules, the New Jersey Uniform Arbitration Act, N.J.S.A. 2A:23B-1 to -32, and to the extent applicable, the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

Prior to the arbitration hearing, plaintiff notified defendant that Metzger would testify at the arbitration testimony. Plaintiff indicated he would serve as a fact witness, not an expert witness.

8

C.

After hearings over three diverse dates over a five-month period, the arbitrator decided in favor of plaintiff's breach of contract claim. In a thirty-page written decision, the arbitrator found:

> [The parties'] business relationship did not involve a single, oral or written contract for a specific consulting service. Instead, their relationship involved a series of written contracts establishing a pattern of business dealings that included not only very specific undertakings, but other undefined and unwritten supportive services.
>
> . . . .
>
> . . . [They] entered into several written agreements that cannot be read as stand-alone contracts, but as a series of interconnected agreements that establishes [defendant's] ongoing commitment to provide [plaintiff] with consulting services on a myriad of healthcare and hospital[-]related issues.
>
> . . . .
>
> . . . [T]he parties entered into a contract obligating [defendant] to perform a Medicare GME/IME reimbursement analysis, including a [five]-year P&L[7] projection for [plaintiff]'s stand-alone teaching program . . . . [T]he scope of [defendant's] duties under this agreement mirrored in many respects that which [defendant] performed under the parties['] June 2012 agreement . . . . [T]he evidence supports a finding that the parties intended the June 2013 contract

---

[7] P&L refers to "profit and loss."

9

to incorporate the scope and work plan outlined in its 2012 agreement. . . . [I]n performing the type of analysis requested by [plaintiff], [defendant] would have to perform, many if not all, of the work steps outlined in the 2012 engagement letter. Although these terms are not explicitly set forth in any writing, they can be implied or inferred from the parties['] conduct and from the circumstances surrounding their ongoing relationship, including their 2012 agreement for similar services. . . . [Defendant], through its employees, agreed to incorporate its 2012 work plan into its 2013 agreement, including among other things to: (a) review previous analyses related to the teaching program[,] (b) contact and work with the Hospital's MAC for required information to calculate [Meadowland]'s estimated PRA[,] and (c) calculate and provide . . . [Meadowland] with a detailed five . . . year analysis reflecting the estimated total GME and IME Medicare reimbursement.

. . . .

. . . Unfortunately, [defendant] failed to do its due diligence and as a result the MAC was provided with misleading and inaccurate information regarding the hospital's prior residency activity. This misinformation undoubtedly led the MAC to miscalculate the [Meadowland]'s PRA, which in turn led to [defendant] producing and delivering an inaccurate and unreliable analysis and P&L projections.

. . . .

. . . [Defendant] was to provide a Medicare GME/IME analysis and P&L projections that [plaintiff] could reasonably rely on and which would allow it to make an informed decision on whether to proceed with or abandon its plan to establish the [GME] program. . . .

10

and [plaintiff] wanted to obtain an estimate of the profit or loss the program would generate . . . . Unfortunately, what [defendant] provided was not what it was contractually obligated to provide, or what [plaintiff] bargained for.

. . . .

After a careful review of the evidence[,] . . . [defendant]'s failure to investigate [Meadowland]'s prior residency activity, to provide accurate information to the MAC regarding said activity, and to confirm that the PRA was estimated correctly, was a breach of [defendant's] implied promise[] to complete its contractual undertaking in a competent and professional manner.

. . . .

. . . In order to meet MHA's expectations and assist in the decision-making process, [defendant's] employees were therefore obligated to engage in some form of investigatory or due diligence process to ensure the accuracy and reliability of the information and guidance they were providing. . . . Unfortunately, they did nothing of the sort. They did not review costs reports, or access the [Healthcare Cost Report Information System], to confirm their belief that the 2012 shared program was the hospital's only residency activity. Nor did they otherwise engage in any due diligence or investigatory process to verify the accuracy of the information they were providing to and receiving from the MAC. No one at [defendant] challenged or otherwise confirmed the accuracy of the MAC's estimated PRA, the most important and critical component of their analysis. . . . Their failure to investigate . . . resulted in the dissemination and

delivery of unreliable and inaccurate information, which MHA justifiably relied on to its detriment.

. . . .

. . . [A] more objective view of the evidence establishes that MHA justifiably relied on [defendant]'s analysis and P&L projections in deciding to move forward with its teaching program . . . .

. . . .

. . . There is ample evidence, including admissible hearsay, from which I can reasonably conclude that Novitas adjusted the PRA as a result of [Meadowland]'s prior residency activity and determined that [Meadowlands] had been overpaid $1,795,260. [Plaintiff] has presented both documentary and testimonial evidence supporting its damage claim, including the Novitas Audit Adjustment Report[] and the testimony of Dr. Lipsky . . . . Metzger, [plaintiff]'s consultant who is familiar with the hospital's business records, testified that he was directed by [plaintiff] officials to review the hospital's business records and prepare a rate change calculation and impact summary. After reviewing the hospital's business records, and applying the relevant federal regulations, he prepared the requested summary and concluded that the recoupment amount was $1,795,260[]. I found . . . Metzger's testimony entirely credible and therefore find that his estimate of the recoupment amount is reasonably accurate and reliable.

The arbitrator awarded plaintiff $1,927,641.98 inclusive of 3.5%

prejudgment interest of $132,381.98 from May 24, 2018 through August 7,

12

2020, pursuant to Rule 4:42-11(a)(ii), plus per diem interest in the amount of $172.15 from July 1, 2020 until the judgment was fully paid.

The judge granted plaintiff's motion to confirm the arbitration award and denied defendant's cross-motion to vacate the arbitration award. In a thirteen-page memorandum of decision, the judge explained her decision making. She determined the arbitrator considered all the evidence presented and made appropriate credibility findings. The judge determined defendant failed to establish any basis under N.J.S.A. 2A:23B-23 to vacate the arbitration award.

The judge rejected defendant's argument that the arbitrator's ruling exceeded the scope of his authority by relying on the Metzger's barred expert testimony and report to decide the damage award. She reasoned,

> the court is well-aware that it barred . . . Metzger from testifying as an expert witness prior to the arbitration of this matter. However, none of this court's rulings during litigation barred . . . Metzger testifying as a fact witness. As the factfinder, [the arbitrator] correctly allowed him to testify as a fact witness based on his personal knowledge within the confines of [N.J.R.E.] 602. It appears that his testimony was confined to his GME [i]mpact [s]ummary, which had been attached to the [f]irst [a]mended [c]omplaint, and did not include the damage calculations outlined in his expert report. [The arbitrator] was therefore well within his right as the factfinder to consider his testimony based on personal knowledge and to decide to rely on it completely or in part, or not at all.

The judge found the arbitrator's reliance on the 2016 asset purchase agreement (APA) was within his scope of authority because the issue arose after plaintiff rested its case at arbitration, and defendant opened the door by contending plaintiff was not actually damaged from a breach of contract because plaintiff sold Meadowlands and had not shown which entity was responsible for Medicare recoupments.

Finally, the judge rejected defendant's contention that the prejudgment interest award was a manifest denial of justice. She acknowledged the matter involved "protracted and vexatious litigation," allowing both sides to legitimately argue that the other prolonged the case. Nonetheless, she found defendant failed to show that it did not contribute to delaying the dispute's ultimate resolution and therefore, as a matter of equity, plaintiff was entitled to prejudgment interest as allowed by Rule 4:42-11(a)(ii).

II.

Relevant to the issues on appeal, the New Jersey Uniform Arbitration Act provides the following reasons to vacate an arbitration award:

> (1) the award was procured by corruption, fraud, or other undue means;
>
> (2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an

14

arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to section 15 of this act, so as to substantially prejudice the rights of a party to the arbitration proceeding;

(4) an arbitrator exceeded the arbitrator's powers;

(5) there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection pursuant to subsection c. of section 15 of this act not later than the beginning of the arbitration hearing . . . .

[N.J.S.A. 2A:23B-23.]

A court's "review of an arbitration award is very limited." Bound Brook Bd. of Educ. v. Ciripompa, 228 N.J. 4, 11 (2017) (quoting Linden Bd. of Educ. v. Linden Educ. Ass'n ex rel. Mizichko, 202 N.J. 268, 276 (2010)). "An arbitrator's award is not to be cast aside lightly. It is subject to being vacated only when it has been shown that a statutory basis justifies that action." Ibid. (quoting Kearny PBA Loc. # 21 v. Town of Kearny, 81 N.J. 208, 221 (1979)). A decision to vacate or affirm an arbitration award constitutes the resolution of a legal issue that we review de novo. Minkowitz v. Israeli, 433 N.J. Super. 111, 136 (App. Div. 2013).

A-0789-20

"Although the public policy of this State is to favor arbitration as a means of settling disputes which otherwise would go to court, it is equally true that the duty to arbitrate, and the scope of the arbitration, are dependent solely on the parties' agreement." Cohen v. Allstate Ins. Co., 231 N.J. Super. 97, 100-101 (App. Div. 1989) (citations omitted); see also Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 556 (2015). Arbitrators exceed their authority by disregarding the terms of the parties' agreement. Cty. Coll. of Morris Staff Assoc. v. Cty. Coll. of Morris, 100 N.J. 383, 391 (1985). If a party claims the arbitrator exceeded his or her authority because he decided a legal issue outside the scope of the arbitration agreement, the court reviews the arbitrator's interpretation under a "highly deferential" standard. Bound Brook, 228 N.J. at 13 (quoting Metromedia Energy, Inc. v. Enserch Energy Servs., 409 F.3d 574, 579 (3d Cir. 2005)).

Appellate review applies a deferential standard of review to an arbitrator's interpretation of a contract. N.J. Transit Bus Operations, Inc. v. Amalgamated Transit Union, 187 N.J. 546, 548 (2006). "So long as the arbitrator's interpretation of the contractual language is 'reasonably debatable,' a reviewing court is duty-bound to enforce it." Ibid. (quoting Kearny PBA Loc. # 21, 81 N.J.

16

at 221). Therefore, the arbitrator's interpretation must be based on a reasonable interpretation of the contractual language. Ibid. at 555.

On the other hand, because our review of a trial judge's order confirming an arbitration award is a question of law, we owe no special deference to the judge's interpretation of the law and the legal consequences that flow from the established facts. Yarborough v. State Operated Sch. Dist. of City of Newark, 455 N.J. Super. 136, 139 (App. Div. 2018). Our standard of review is thus de novo. Manger v. Manger, 417 N.J. Super. 370, 376 (App. Div. 2010). In addition to this statutory criterion, "a court, 'may vacate an award if it is contrary to existing law . . . .'" Borough of E. Rutherford v. E. Rutherford PBA Loc. 275, 213 N.J. 190, 202 (2013) (quoting Middletown Twp. PBA Local 124 v. Township of Middleton, 193 N.J. 1, 11 (2007)).

With these principles in mind, we turn to defendant's arguments on appeal.

A.

Defendant argues the judge erred when determining "that the first [a]mended [c]omplaint properly alleged the underlying facts o[n] which the breach of contract award is based." It argues that because the June 2012 contract, which was mentioned in the first amended complaint, expressly referenced the GME program with Palisades, it follows that the first amended

complaint only made allegations concerning the work performed for that GME program. Citing Block v. Plosia, 390 N.J. Super. 543, 547 (App. Div. 2007), which vacated an arbitrator's award to the plaintiff based on a consumer fraud claim because the plaintiff pled a breach of contract claim, defendant argues plaintiff's breach of contract claim based on the June 2013 contract was neither mentioned in the first amended complaint nor did the parties agree it was to be considered by the arbitrator. Claiming its entire defense was premised upon establishing that it did not breach the June 2012 contract, defendant argues it did not have notice of the additional breach of the June 2013 contract claim. Upon finding defendant did not breach the June 2012 contract, the arbitrator's assignment was complete and he should not have addressed the March 2013 cost reporting agreement.

Defendant further argues the factual basis of plaintiff's breach of contract claim in the first amended complaint was "substantially modified" by the time of the arbitration, essentially asserting a new claim that was never asserted before and should not have been considered by the arbitrator. In sum, defendant maintains the arbitrator exceeded his powers under the stipulation of dismissal, the arbitration agreement, and November 22, 2019 court order.

18

We are unpersuaded by defendant's arguments.  When the first amended complaint was dismissed with prejudice, the confirming order stated that "all claims asserted by [plaintiff] in the [f]irst [a]mended [c]omplaint . . . shall be resolved by [b]inding [a]rbitration."  There was no provision limiting arbitration to only those claims alleged in the first amended complaint.  Given that we view pleadings "with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim," Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 56 (App. Div. 1997) (quotation marks omitted), and we do not require them to "spell out the legal theory upon which [the allegations are] based," Farese v. McGarry, 237 N.J. Super. 385, 390 (App. Div. 1989), plaintiff's breach of contract claim was set forth in the factual allegations of the first amended complaint.  As Judge Espinales-Maloney correctly explained, the first amended complaint clearly asserted that "the breach of contract claim was based upon the alleged misconduct involving all budget projection and guidance, including the guidance and projection work for the GME program."

Defendant's reliance on Plosia is misplaced.  There, the plaintiff pled a breach of contract claim, but the arbitrator ruled in the plaintiff's favor based on a violation of the Consumer Fraud Act, N.J.S.A. 56:8-19, which the plaintiff did not allege.  Plosia, 390 N.J. Super. at 555-556.  In the present case, however,

19

plaintiff pled a breach of contract claim and the arbitrator ruled based on a breach of contract. Contrary to defendant's arguments, the first amended complaint alleged breach of contract claims and asserted relevant facts putting defendant on notice that it had to defend against breach of contract claims for all the parties' agreements from 2012 through 2017. Moreover, defendant was aware that it might have to defend itself against a breach of implied-in-fact contract claim prior to deciding to arbitrate when plaintiff made such claim in its April 2019 pre-trial brief and memo.

B.

Defendant argues the arbitrator erred in ruling there was a June 2013 implied contract that it breached. Relying on Moser v. Milner Hotels, Inc., 6 N.J. 278, 280-81 (1951), it argues that where there is undisputed evidence of an express contract covering the services at issue, there cannot be a simultaneous implied contract. Defendant also argues that "the undisputed facts do not support the creation of another" separate June 2013 contract, because there was no meeting of the minds. Citing Goldfarb v. Solimine, 245 N.J. 326, 343 n.7 (2021), defendant maintains there was no factual support for the arbitrator's finding that an express contract covered services to be rendered and a quasi-contract was breached because they are mutually exclusive claims, and a

20

breach of a quasi-contract was never pled in the first amended complaint. We are unpersuaded.

The arbitrator ruled that "subsequent to this exchange of the . . . [May 9, 2013] emails, [defendant] dropped its demand for [entering] a new agreement and decided to provide and bill the services under the reimbursement support service[] provisions of the March 2013 cost report agreement." Also, the arbitrator did not find that the GME analysis for the stand-alone program was provided under the March 2013 cost reporting agreement. Contrary to defendant's assertion, the arbitrator never determined the parties had a quasi-contract[8] nor that the June 2013 contract was an express contract. Instead, he found the parties had an implied-in-fact contract, agreeing to terms based on the 2012 agreement. Considering that an implied-in-fact contract occurs where "[a party's] manifest assent to the terms of an offer through . . . conduct," Weichert Co. Realtors, 128 N.J. at 436, we discern no reason to upset the arbitrator's finding that the parties' conduct and payment confirmed the formation of a binding implied-in-fact contract that was breached.

---

[8] A quasi-contract is "imposed by the law for the purpose of bringing about justice without reference to the intention of the parties." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992) (internal quotations omitted).

A-0789-20

C.

Defendant argues the arbitrator erred in relying on Metzger's testimony and the GME impact summary. Defendant asserts that because Judge Espinales-Maloney ordered that Metzger's expert report was inadmissible net opinion and barred him from testifying at trial for plaintiff, the arbitrator exceeded his powers by using Metzger's testimony to determine the amount of plaintiff's damages. Defendant argues the judge mistakenly found Metzger's arbitration testimony was confined to the GME impact summary which produced the same damage calculations as those calculated in the inadmissible expert report. In addition, defendant argues plaintiff never provided evidence of its damages, the recoupment amount. Lastly, defendant contends Metzger's testimony as a fact witness constitutes "new evidence" that should have been barred based on the judge's November 22, 2019 order. We are unpersuaded.

Metzger's arbitration testimony was as a fact witness. Plaintiff advised defendant prior to the hearing that would be the scope of his testimony. Because Metzger did not testify as an expert witness, his testimony did not violate the court order barring his expert report inadmissible opinion. Metzger's testimony was limited to facts he had personal knowledge of, namely, his GME impact summary, which was not part of his prohibited expert report. The GME impact

22

summary is a one-page document identified in the first amended complaint and did not include the damage calculations outlined in the expert report. Defendant did not obtain a court order barring the admissibility of the GME impact summary as it did with Metzger's expert report. Thus, defendant's right to challenge the summary is deemed waived. See Knorr v. Smeal, 178 N.J. 169, 177 (2003) ("The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference."); see also State v. Walker, 385 N.J. Super. 388, 410 (App. Div. 2006) ("Generally, issues not raised below, even constitutional issues, will not ordinarily be considered on appeal unless they are jurisdictional in nature or substantially implicate public interest."). The arbitrator was thus well within his right to consider Metzger's testimony as a fact witness identifying plaintiff's damages based on the GME impact summary. Hence, the judge properly rejected defendant's argument that Metzger's testimony was prohibited expert opinion.

D.

Defendant contends the arbitrator's admission of and reliance on the 2016 APA was outside the scope of his authority and violated Judge Espinales-Maloney's orders. We are unpersuaded.

23

The 2016 APA indicated plaintiff was still responsible for reimbursement payments following the sale of Meadowlands. Defendant opened the door concerning the 2016 APA when, after plaintiff rested its case, defendant raised the theory that, due to the sale of Meadowlands, plaintiff might not be responsible for the reimbursement payments. See Grewal v. Greda, 463 N.J. Super. 489, 508-509 (App. Div. 2020) (recognizing that the "opening the door" doctrine authorizes a party to admit evidence which otherwise would have been excluded when the opposing party has made unfair prejudicial use of related evidence). Given that defendant raised the issue of the sale after plaintiff rested its case, exclusion of evidence regarding the 2016 APA would have unfairly prejudiced plaintiff. Further, the admission of the 2016 APA was probative and did not outweigh by the risk of "undue prejudice" to defendant as required by N.J.R.E. 403. Simply put, the arbitrator did not exceed the scope of his authority by considering it in rendering his decision.

E.

Finally, defendant argues the award of prejudgment interest from May 24, 2018 through August 7, 2020 was beyond the scope of the arbitrator's authority because it encompassed time caused by plaintiff's delay. Defendant explains that plaintiff has not produced any evidence showing if or when plaintiff paid the new Meadowlands owner for any recoupments resulting from the adjusted

24

PRA for the stand-alone GME Program. Consequently, plaintiff should not be able to collect prejudgment interest for any period when it had use of the money. Again, we are unpersuaded by defendant's argument.

"The award of prejudgment interest on contract and equitable claims is based on equitable principles." County of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006). An award in a contract case, its calculation, and the determination of when it starts to run is within the sound discretion of the trial court. Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009); Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 4:42-11 (2022). An appellate court should not interfere with a prejudgment interest award unless it is a manifest denial of justice. County of Essex, 186 N.J. at 61.

In considering her intimate knowledge of the pre-arbitration litigation, the judge reasoned "this matter involved protracted and vexatious litigation—including extensive motion practice—that likely prolonged the life of the case. Both sides can argue that the other caused the delay given the procedural history in this case." Given the discretionary nature and heightened standard of review for prejudgment interest awards, the evidence in the record, and the recognition of Judge Espinales-Maloney's in-depth familiarity with this case and the actions

of both parties, we discern no abuse of discretion to warrant setting aside or modify the arbitrator's prejudgment interest award.

Any arguments made by defendant that we have not expressly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION